**TENNECO, INC., a Delaware corporation acting by and through its Division, Tennessee Gas Pipeline Company**

v.

**SUTTON, Raymond T., Commissioner of Conservation and Assistant Secretary, Office of Conservation, Department of Natural Resources, State of Louisiana.**

**INTERSTATE NATURAL GAS ASSOCIATION OF AMERICA**

v.

**SUTTON, Raymond T., Commissioner of Conservation and Assistant Secretary, Office of Conservation, Department of Natural Resources, State of Louisiana, and Guste, William, J., Jr., Attorney General of the State of Louisiana.**

Civ. A. Nos. 80–17–B, 80–29–B.

United States District Court, M. D. Louisiana.

Dec. 9, 1981.

Burt W. Sperry, Shotwell, Brown & Sperry, Monroe, La., for Tenneco, Inc.

Gene W. Lafitte, John W. Wilson, Deborah B. Price, Liskow & Lewis, New Orleans, La., for Interstate Natural Gas Ass'n of America.

Carmack M. Blackmon, Baton Rouge, La., for Raymond T. Sutton and William J. Guste, Jr.

Dennis Vidrine, Lafayette, La., for Raymond T. Sutton.

Shelly C. Zwick, Asst. U. S. Atty., Baton Rouge, La., Jerome Nelson, Jerome N. Feit,

J. Paul Douglas, Federal Energy Regulatory Commission, Washington, D. C., for plaintiff intervenor Federal Energy Regulatory Commission.

R. Gordon Kean, Jr., William R. D'Armond, Leonard L. Kilgore, III, Sanders, Downing, Kean & Cazedessus, Baton Rouge, La., for intervenor as defendant Louisiana Chemical Assn.

POLOZOLA, District Judge:

## I. INTRODUCTION

These cases[1] involve a constitutional challenge to Act 732 of the 1979 Regular Session of the Louisiana Legislature, La. R.S. 30:607 (Act 732), Regulation 14 issued by the Louisiana Department of Natural Resources, Article IX, Section 2(B) of the Louisiana Constitution of 1974, and the Natural Gas Policy Act of 1978, 15 U.S.C. § 3301, et seq. (NGPA). For reasons which

follow, the Court finds that the NGPA is constitutional and that Act 732, Regulation 14 and Article IX, Section 2(B) of the Louisiana Constitution of 1974 are invalid under the Supremacy and Commerce Clauses of the United States Constitution.

## II. STATEMENT OF THE CASE

Tenneco, Inc.,[2] the Interstate Natural Gas Association of America (INGAA)[3] and the Federal Energy Regulatory Commission (FERC)[4] challenge the constitutionality of Act 732, Regulation 14 issued thereunder by the Louisiana Department of Natural Resources, and Article IX, Section 2(B) of the Louisiana Constitution of 1974 on the grounds that this Act, regulation and constitutional provision are invalid under the Commerce,[5] Supremacy,[6] and Due Process Clauses[7] of the United States Constitution and the NGPA and the Natural Gas Act (NGA).[8] Named as defendants in these

1. On January 7, 1980, Tenneco, Inc. filed a civil action entitled, *Tenneco, Inc. v. Raymond T. Sutton,* CA 80–17–B (M.D.La.), naming Raymond T. Sutton as a defendant. On January 14, 1980, Interstate Natural Gas Association of America filed a suit entitled, *Interstate Natural Gas Association of America v. Raymond T. Sutton, et al.,* CA 80–29–B (M.D.La.). The Federal Energy Regulatory Commission intervened as a plaintiff in both suits. The Louisiana Chemical Association has intervened as a defendant in both actions. The Court consolidated the cases for trial.

2. Tenneco, through its division Tennessee Gas Pipeline Company, purchases, transports and sells natural gas in interstate commerce. Tenneco is a natural gas company within the meaning of § 2(6) of the NGA, 15 U.S.C. § 717a(6), an interstate pipeline within the meaning of § 2(15) of the NGPA, 15 U.S.C. § 3301(15), and is subject to regulation by the Federal Energy Regulatory Commission under those acts and the Department of Energy Organization Act (DOE Act), 42 U.S.C. § 7101, et seq.

3. INGAA is a nonprofit national trade association whose membership includes thirty-one (31) interstate natural gas transmission companies, one of which is Tenneco. These members of INGAA are each subject to the regulatory jurisdiction of the Federal Energy Regulatory Commission under various provisions of the NGA, the NGPA, and the DOE Act. Each is a natural gas company within the meaning of the NGA and an interstate pipeline within the meaning

of the NGPA. INGAA represents its membership in matters affecting the interest of the interstate natural gas transmission industry.

4. FERC is an independent regulatory commission within the Department of Energy. DOE Act, § 401(a), 42 U.S.C. § 7171(a). It is responsible for administering the enforcement, among other things, of various provisions of the NGA, including the issuance of certificates of public convenience and necessity and the regulation of abandonments pursuant to § 7 of the NGA, 15 U.S.C. § 717f. It is also responsible for the administration and enforcement of the NGPA, 15 U.S.C. § 3301, et seq., NGPA §§ 501(a), 504, 15 U.S.C. §§ 3411(a), 3414. On October 1, 1977, pursuant to the provisions of the DOE Act an executive order Number 12,-009, 42 Fed.Reg. 46267 (1977), FERC succeeded to certain functions of the Federal Power Commission (DOE Act § 401(a), 42 U.S.C. § 7171(a)). Hereinafter, the Federal Power Commission and the Federal Energy Regulatory Commission will be referred to as FERC.

5. United States Constitution, Article I, § 8, Clause 3.

6. United States Constitution, Article VI, Clause 2.

7. United States Constitution, Fourteenth Amendment.

8. 15 U.S.C. § 717, et seq.

**416**

suits are Raymond T. Sutton,[9] and William J. Guste,[10] The Louisiana Chemical Association (LCA)[11] has intervened as a defendant in both actions.

Tenneco and FERC contend that Act 732, Regulation 14, and Article IX, Section 2(B) of the Louisiana Constitution of 1974 are constitutionally invalid because they: (1) infringe upon an area preempted by Congress by the NGA and the NGPA, and thus violate the Supremacy Clause of the United States Constitution; (2) accord to Louisiana's residents a preferred right of access to natural gas produced within the State of Louisiana over consumers in other states and thus provide a means to obstruct and burden the transmission of natural gas from Louisiana into other states in violation of the Commerce Clause; and (3) deprive Tenneco and certain members of INGAA of their freedom to contract without serving any legitimate state purpose, and thus are violations of the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

The defendants deny that the statute, legislation and constitutional provision involved in this case are invalid. Defendants further contend that there is no case or controversy for the Court to determine in this case. In essence defendants contend that the State of Louisiana acted in a constitutional manner because Act 732 does not interfere with or conflict with the provisions of the NGPA. Defendants further contend in a counterclaim filed herein that the NGPA is unconstitutional because: (1) it exceeds the authority of Congress under the Commerce Clause; (2) it violates the provisions of the Tenth Amendment of the United States Constitution; and (3) it violates the Intergovernmental Immunities Doctrine of the United States Constitution.

After the suit was filed, the plaintiffs filed a motion for summary judgment which was denied by the Court. Thereafter, a trial on the merits was held by the Court. The parties have now filed extensive briefs with the Court, together with proposed findings of fact and conclusions of law.

## III. THE ISSUES PRESENTED

There are six basic issues the Court must determine:

(1) whether there is a case or controversy for the Court to decide;

(2) whether the NGPA is unconstitutional because it violates the Commerce Clause, the Tenth Amendment and the Intergovernmental Immunities Doctrine of the United States Constitution;

(3) whether the decision rendered in *State of Oklahoma, et al. v. Federal Energy Regulatory Commission*, 494 F.Supp. 636 (W.D.Okla.1980), affirmed, 661 F.2d 832 (10 Cir. 1981) is binding on the defendants under the doctrine of res judicata;

(4) whether Article IX, § 2(B) of the Louisiana Constitution, Act 732 and Regulation 14 violate the Supremacy Clause of the United States Constitution because they establish a regulatory scheme directly affecting interstate commerce in conflict with the NGPA;

(5) whether Article IX, § 2(B) of the Louisiana Constitution, Act 732 and Regulation 14 violate the Commerce Clause of the United States Constitution by granting natural gas consumers in Louisiana a preferred right of access over consumers in other states to natural gas produced in Louisiana;

---

**9.** Raymond T. Sutton is the Commissioner of Conservation and the Assistant Secretary of the Office of Conservation of the Department of Natural Resources for the State of Louisiana. In that capacity, he has responsibility for administering and enforcing Article 9, § 2(B) of the Louisiana Constitution of 1974, as implemented by Act 732 of the 1979 Regular Session of the Louisiana Legislature, La.R.S. 30:607.

**10.** William J. Guste, Jr. is the Attorney General of the State of Louisiana. In that capacity, he is the chief legal officer of Louisiana and head of the Louisiana Department of Justice.

**11.** LCA is a nonprofit corporation whose members are located in Louisiana and use gas for industrial purposes which is produced in Louisiana.

(6) whether these same provisions of Louisiana law violate the Due Process Clause of the Fourteenth Amendment by depriving or limiting the freedom of contract of Tenneco and other similar companies without serving any legitimate state interest.

## IV. THE CONSTITUTIONAL PROVISIONS, STATUTES AND REGULATIONS INVOLVED IN THIS CASE

The Court believes that a summary of the applicable constitutional provisions, statutes and regulations is necessary to a proper understanding and resolution of the issues involved in this case.

### A. FEDERAL CONSTITUTIONAL PROVISIONS

Under the Commerce Clause, the Congress is granted the power and authority to regulate commerce "among the several States".[12] The Supremacy Clause provides that the United States Constitution and laws made pursuant thereto "shall be the supreme Law of the Land."[13] The Due Process Clause of the Fourteenth Amendment to the United States Constitution prohibits the state from depriving any person of "life, liberty, or property without due process of law."[14] Under the Tenth Amendment to the United States Constitution, "powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States...".

### B. THE NATURAL GAS ACT

The NGA was passed in 1938 in order to give the federal government regulatory power over those areas where the states could not act. The NGA gave the Federal Power Commission (FPC)[15] broad authority to establish just and reasonable rates for the interstate transportation and interstate sale and resale of natural gas[16] and to issue certificates for the interstate transportation and sale of natural gas and the construction and operation of facilities for such sales and transportation.[17] Retail sales for ultimate public consumption and production and gathering were specifically exempted from the FPC's jurisdiction.[18] However, sales for resale by producers have been held subject to regulation under the NGA.[19] Section 7 of the NGA prohibits any person from selling or transporting natural gas in interstate commerce without first obtaining a certificate of public convenience and necessity from the Commission.[20] In addition, Section 7(c)(2) provides that the Commission may issue certificates of public convenience and necessity authorizing an interstate pipeline to transport natural gas for high-priority users where the user purchases the gas directly from a producer or produces the gas itself.[21] The Commission may also

---

12. Article I, § 8, Clause 3 of the United States Constitution provides in part: "The Congress shall have the power ...: To regulate Commerce ... among the several States ..."

13. Article VI, Clause 2 of the United States Constitution provides in part: "This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; ... shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."

14. Fourteenth Amendment to the United States Constitution provides in § 1: "No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty or property without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

15. FERC has succeeded to certain functions of the FPC. See footnote 4, supra.

16. 15 U.S.C. §§ 717c, 717d (1976).

17. 15 U.S.C. § 717f (1976).

18. 15 U.S.C. § 717b (1976).

19. *Phillips Petroleum Co. v. Wisconsin*, 347 U.S. 672, 74 S.Ct. 794, 98 L.Ed. 1035 (1954).

20. Section 7(c) of the NGA was amended by § 608 of the Public Utility Regulatory Policies Act of 1978, Pub.L. 95–617, 92 Stat. 3117, 3173 (1978). Original § 7(c) was renumbered as § 7(c)(1), and a new § 7(c)(2) was added.

21. 15 U.S.C. § 717f(c)(2) (Supp. II 1978).

attach to such certificates such reasonable terms and conditions as the public convenience and necessity may require.[22] Finally, the NGA prohibits the termination of certificated service without the prior approval of the Commission.[23]

## C. THE NATURAL GAS POLICY ACT OF 1978

On April 20, 1977, President Carter submitted his National Energy Plan to the Congress. The natural gas provisions of this plan were designed to resolve the jurisdictional limitations of the NGA and to alleviate gas shortages resulting from inadequate natural gas supplies in the interstate pipeline system.[24]

In passing the NGPA, Congress hoped to encourage the production and exploration of natural gas sources and to maintain adequate supplies of natural gas in the interstate markets.[25]

■ The key elements of the NGPA are: (1) extension of controls to the intrastate natural gas market,[26] (2) phased deregulation of new natural gas,[27] and (3) an attempt to provide to interstate pipelines and their customers parity of access to new supplies of natural gas and to gas presently flowing in the intrastate market.[28] "Parity of access permits an interstate pipeline to purchase, and producers and intrastate pipelines to sell, gas not presently committed to the interstate market under the same pricing, certification and abandonment rules that apply to buyers and sellers in the intrastate market."[29] The NGPA, as part of a comprehensive national energy plan, regulates the prices of various categories of natural gas, provides for incremental pricing of natural gas used for certain industrial purposes, establishes curtailment policies with respect to essential agricultural uses of natural gas, authorizes certain Presidential actions in the event of a natural gas supply emergency, and outlines a plan of deregulation. The basic structure of the NGPA consists of six titles covering the following subjects: Wellhead Pricing (Title I); Incremental Pricing (Title II); Additional Authorities and Requirements (Title III); Natural Gas Curtailment Policies (Title IV); Administration, Enforcement and Review (Title V); and Coordination with the Natu-

---

22. 15 U.S.C. § 717f(e).

23. 15 U.S.C. § 717f(b).

24. National Energy Plan, Executive Office of the President 50, 50–53 (1977). President Carter's proposal was introduced in the House of Representatives as H.R. 6831, 96th Cong., 1st Sess. 1977. The National Energy Plan stated in part: "The Natural Gas Act never contemplated the dramatic increase in demand for natural gas which has resulted from the sudden quadrupaling of the world price of oil in 1973–74 and from growing environmental concern in recent years. As a result of regulation under the Act, natural gas is now substantially underpriced, and there is excess demand. Existing supplies are being wasted on nonessential industrial and utility uses. A pricing policy which evolved at a time when gas was a surplus by-product of oil production is no longer sensible in a world where gas is a premium fuel in short supply... [T]he distinction between the unregulated intrastate and regulated interstate markets made little practical difference as long as gas was a cheap, surplus fuel. Producer claims that historic cost-based regulation is no longer appropriate for a premium fuel in short supply are fundamentally correct. But for precisely the same reason the intrastate-interstate distinction has also become unworka-

ble, indeed intolerable, as a limited amount of new gas increasingly flows to the unregulated intrastate market at the expense of interstate consumers. The shift in the natural gas market from surpluses to shortages requires the abandonment of historic cost-base regulation and of the artificial distinction between interstate and intrastate markets." National Energy Plan, pp. 50–53.

25. H.Rep.No. 95–436 95th Cong., 2d Sess. 10, Reprinted in 1978 (U.S.Code Cong. and Ad. News 7855, 7858–59, H.Rep.No. 95–496 Part IV, 95th Cong., 2d Sess. 96–97, Reprinted in (1978) U.S.Code Cong. and Ad.News 7659, 8540–41.

26. 124 Cong.Rec. S14901 (daily ed., Sept. 11, 1978) (Remarks by Senator Pearson).

27. 124 Cong.Rec. S14870 (daily ed., Sept. 11, 1978) (Remarks of Senators Bartlette and Jackson); 124 Cong.Rec. S15103 (daily ed., Sept. 14, 1978) (Remarks of Senator Goldwater).

28. See footnote 26, supra.

29. 19 *Natural Resources Journal*, 829, 848 (1979).

ral Gas Act/Effect on State Laws (Title VI). Responsibility for administering and enforcing the NGPA rests primarily with FERC.

The NGPA establishes price ceilings for all first sales of natural gas produced in the United States without regard to whether it is designated as intrastate or interstate natural gas.[30] Certain high-cost gas is removed from NGPA price controls one year after the effective date of November 9, 1978.[31] On January 1, 1985, new natural gas,[32] certain existing intrastate contract gas,[33] and new onshore development well gas[34] will be removed from NGPA price controls. In 1987, new onshore production well gas produced from a depth of 5,000 feet or less which was not committed or dedicated to interstate commerce will be deregulated. Limited authority for reimposition of price ceilings after June 30, 1985, is provided for in the NGPA.[35] The NGPA is basically an overlay of the NGA since the NGA remains applicable to interstate transportation and interstate sales for resale, unless a specific exclusion of the NGA jurisdiction is provided.[36] The NGPA eliminates many of the NGA's price and nonprice producer regulations.[37] Under the provisions of the NGPA, the NGA is inapplicable after November 30, 1980 to first sales of natural gas which were not committed or dedicated to interstate commerce on November 8, 1978,[38] and to first sales of committed or dedicated gas which have been determined to be new natural gas, new onshore production well gas, or within certain categories of high-cost gas.[39] These provisions remove the Commission's authority to establish just and reasonable prices under the NGA for producer sales into the interstate market[40] and to indirectly regulate these sales through control of the interstate pipeline purchaser's pass through of purchase gas costs. These provisions also relieve producers of gas not committed or dedicated to interstate commerce and gas in the new natural gas and new onshore production well categories and certain high-cost categories, from any requirement of receiving certification or abandonment authorization, or of making rate filings under the NGA.

Impediments to producer sales into the interstate market of natural gas which was not committed to that market at the time the NGPA was enacted are eliminated.[41]

Title III of the NGPA authorizes certain sales between interstate and intrastate pipelines and removes regulatory deterrents to sales into the interstate market by intra-

---

**30.** 15 U.S.C. § 3311(b)(4) (Supp.1979).

**31.** Gas from a completion well located below 15,000 feet, gas from geopressurized brine or Devonian shale, and occluded gas from coal seams. 15 U.S.C. § 3317 (Supp.1979).

**32.** 15 U.S.C. § 3312(c).

**33.** 15 U.S.C. § 3331(a)(3). This category includes gas sold under an existing contract, successor to an existing contract, or a rollover contract which was not dedicated to interstate commerce as of November 9, 1979, and the price of which exceeded $1.00 per million BTU's for the last deliveries occurring on December 31, 1984.

**34.** 15 U.S.C. § 3331(a)(2). Gas from new onshore production wells that were not dedicated to interstate commerce on April 20, 1977, and is produced from a completion location at a depth of more than 5,000 feet is deregulated in 1985.

**35.** 15 U.S.C. § 3332.

**36.** See Title 6 of the NGPA.

**37.** See 124 Cong.Rec. S16258–16259 (daily ed., Sept. 27, 1978) (Remarks by Senator Muskie).

**38.** 15 U.S.C. § 3431(a)(1)(A).

**39.** These categories are gas from the completion location below 15,000 feet, gas from geopressurized brine or Devonian shale or occluded gas from coal seams. 15 U.S.C. § 3431(a)(1)(B).

**40.** Except where the NGPA authorizes the commission to set just and reasonable rates higher than the otherwise applicable NGPA rates. See 15 U.S.C. §§ 3314(b)(2), 3316(c) and 3319(b)(2).

**41.** 124 Cong.Rec. S14869 (daily ed., Sept. 11, 1978) (Remarks of Senator Jackson). See also 124 Cong.Rec.H. 13134–13135 (daily ed. October 14, 1978) (Remarks of Congressman Glickman and letter of Chairman of the Federal Reserve Board, G. William Miller).

state pipelines.[42] FERC is granted the authority to authorize the transportation of natural gas by interstate or intrastate pipelines by or on behalf of each other.[43] Intrastate pipelines may be authorized by FERC to sell natural gas to interstate pipelines at a fair and equitable price.[44] Sales authorized under 15 U.S.C. § 3371(b) are limited to a period of two years and are subject to interruption by the seller or termination by FERC. FERC is permitted to authorize intrastate pipelines to assign to interstate pipelines and local distribution companies they serve, the intrastate pipeline's contractual rights to receive surplus natural gas.[45] 15 U.S.C. § 3374 makes unenforceable any contract which: (1) prohibits commingling of contractual gas with gas subject to the NGA; (2) prohibits the sale or transportation to or by any interstate pipeline or otherwise prohibits the sale or transportation of natural gas in interstate commerce; (3) terminates or grants an option to terminate contractual obligations as a result of commingling, sale or transportation. FERC is granted authority [46] to set minimum durations on contracts affecting intrastate gas and certain categories of deregulated gas [47] as long as FERC does not deny adequate supplies of natural gas to intrastate pipelines by divesting supplies of natural gas to interstate pipelines. 15 U.S.C. § 3375(b) also provides that high-cost natural gas,[48] new natural gas,[49] or natural gas produced from any new, onshore production well [50] which is dedicated or committed to inter-

state commerce on the day before the date of the enactment of the NGPA must be offered for sale into the interstate commerce when any existing contract expires and the interstate purchaser has the right of first refusal. This right of first refusal is in addition to any certificate and abandonment requirements that were not eliminated by Title VI of the NGPA.[51]

Title V of the NPGA sets forth the procedure for administration, enforcement and review.[51] Title VI, defines the application of the NGA and the jurisdiction of FERC under the NGA.[52]

The legislative history of the NGPA is voluminous. The Court has reviewed this legislative history in detail.[53] Until the NGPA was enacted by Congress, wholly intrastate natural gas was not subject to price regulation. As a result, interstate pipelines began to experience gas shortages, while intrastate pipelines had sufficient gas reserves to supply its customers. By 1970, interstate pipelines were unable to meet their contract commitments because of the shortage of natural gas being sold on the interstate market. The low prices imposed on interstate natural gas by the FPC not only discouraged exploration and production of gas but also channeled supplies into the unregulated intrastate market where the price of gas was much higher.[54] By 1974, aggregate additions to natural gas reserves constituted only 40% of the marketed production of natural gas on a nation-

---

**42.** 15 U.S.C. §§ 3361, et seq.

**43.** 15 U.S.C. § 3371(a)(1)(ii).

**44.** 15 U.S.C. § 3371(b).

**45.** 15 U.S.C. § 3372.

**46.** 15 U.S.C. § 3375.

**47.** High-cost natural gas which qualifies for deregulated price treatment under 15 U.S.C. § 3317, § 107(c)(1)(2)(3) or (4); new natural gas under 15 U.S.C. § 3312(c), § 102(c) and natural gas produced from any new, onshore production well under 15 U.S.C. § 3313(c), § 103(c).

**48.** As defined in 15 U.S.C. § 3317(c)(1), (2), (3) or (4).

**49.** As defined in 15 U.S.C. § 3312(c).

**50.** As defined in 15 U.S.C. § 3313(c).

**51.** 15 U.S.C. §§ 3431–32.

**51.** 15 U.S.C. §§ 3411–3417.

**52.** 15 U.S.C. §§ 3431–3432.

**53.** See *Oklahoma v. Federal Energy Regulatory Commission*, 494 F.Supp. 636 (W.D.Okla.1980), affirmed, 661 F.2d 832 (10 Cir. 1981) for a review of the legislative history of the NGPA.

**54.** Florino, "Regulating the Natural Gas Industry: Two Decades of Experiences," *Economic Regulatory Policies*, 89, 94–95 (J. Anderson Edition 176)

al basis.[55] Sales by domestic producers to interstate pipelines had dropped slightly more than five percent from their 1970 levels.[56] Most of the additions to natural gas reserves were going to the intrastate rather than the interstate market. Between 1964 and 1969, 67 percent of reserve additions were committed to the interstate market. However, in the succeeding five years less than five percent of reserve additions were committed to the interstate market because of the change in the relative prices in the two markets.[57] The 95th Congress began during an extremely serious natural gas shortage in the interstate market. Congress responded by enacting the Emergency Natural Gas Act of 1977 (ENGA),[58] an emergency temporary statute which authorized the President to: (1) allocate natural gas among interstate pipelines to meet designated high-priority uses;[59] and, (2) permit interstate pipelines and local distribution companies served by such pipelines to purchase natural gas[60] from producers, intrastate pipelines, local distribution companies and certain other persons.[61] Thereafter, the Congress enacted the NGPA. Whether this Act will solve the problems Congress sought to eliminate by its enactment is a continuing topic of discussion in Congress and elsewhere and is not a question this Court must or is qualified to determine. The only issue before this Court is the constitutionality of the various federal and state statutes and constitutional provisions involved in this case.

### D. THE LOUISIANA CONSTITUTIONAL PROVISION

Article IX, Section 2(B) of the Louisiana Constitution of 1974 provides:

"(B) Pipelines. No intrastate natural gas pipeline or gas gathering line shall be connected with an interstate natural gas pipeline, and no interstate natural gas pipeline shall be connected with an intrastate natural gas pipeline, without a certificate of public convenience and necessity issued as provided by law after application for the connection and hearing thereon."

### E. THE LOUISIANA STATUTE AND REGULATION

Act 732 of the 1979 Legislature, La.R.S. 30:607, provides in pertinent part:

"C. In the case of natural gas which was not committed or dedicated to interstate commerce on the day before the date of enactment of this Section, and which is produced on or after the date of enactment, the assistant secretary of the office of conservation shall, by rule, establish requirements and procedures to be adhered to by all producer-sellers of such gas as follows:

(1) No person shall connect any intrastate natural gas pipeline with any interstate natural gas pipeline or introduce natural gas into any natural gas pipeline without first obtaining a certificate of public convenience and necessity, as re-

**55.** House of Representatives Report No. 543, 95th Cong. 1st Sess. 387 (1977).

**56.** House of Representatives Report No. 543, 95th Cong. 1st Sess. 390 (1977). In 1970, natural gas producers sold 14,440,737 million cubic feet (mcf) of gas to interstate transmission companies. By 1974, that figure had declined to 13,524,075 mcf.

**57.** House of Representatives Report No. 543, 95th Cong. 1st Sess. 388. See also the Federal Energy Administration National Energy Outlook 122 (1976).

**58.** Pub.L. 95–2 §§ 1–14, 91 Stat. 4, 15 U.S.C. § 717 note (Supp.1977). The ENGA has now expired.

**59.** Id. § 717 note, § 4(a)(1). In addition, the President could allocate natural gas from inter-

state pipelines to local distribution companies and could require intrastate pipelines to transport allocated gas.

**60.** Id. § 717 note, § 6.

**61.** The President could impose terms and conditions on such sales, including provisions pertaining to fair and equitable prices. NGA jurisdiction did not attach to any sale authorized by the President under the ENGA, or to any intrastate pipeline transportation in connection with such a sale. 15 U.S.C. § 717 note 6(b). The allocation authority of the ENGA was never used. However, the emergency sales provisions administered by the FPC were used extensively until August 1, 1977.

quired by Article IX, Section 2(B) of the Louisiana Constitution, from the assistant secretary of the office of conservation.

(2) Prior to committing such natural gas to interstate commerce, a bona fide offer to sell such gas must be made to intrastate natural gas users or intrastate natu-ral gas transporters, or both, as defined in L.R.S. 30:503(6) located within the state of Louisiana and capable of taking delivery thereof within a reasonable time . . ." [62]

The administrative and enforcement provisions of the Louisiana Natural Resources

---

**62.** La.R.S. 30:607 provides in its entirety:

§ 607. State owned natural gas; producer-seller rules

A. As used in this section, the following words and phrases shall have the following meaning:

(1) "Natural gas" is defined as all gas capable of being produced or which is produced within the state of Louisiana which is not subject to federal jurisdiction under the Natural Gas Act, 15 U.S.C. 717, et seq., including natural gas transported through the use of interstate pipelines where such use of interstate pipelines is or may hereafter be exempt from the control of the Federal Energy Regulatory Commission under the Natural Gas Act or rules and regulations promulgated by the Federal Energy Regulatory Commission thereunder; and gas, wherever produced, which is or may be transported into this state and delivered into an intrastate pipeline system in this state to be used or consumed wholly within this state.

(2) "Intrastate natural gas pipeline" is defined as all facilities located within the state of Louisiana which may be or are utilized for the production, gathering or transportation of intrastate natural gas and which are not subject to federal jurisdiction under the Natural Gas Act, 15 U.S.C. 717, et seq., including, but not limited to, wellhead facilities, gathering facilities, pipeline facilities, and all facilities connected thereto or utilized therewith.

B. In the case of any first sale under any roll-over contract of natural gas which was not committed or dedicated to interstate commerce on the day before the date of enactment of this act and which constitutes the natural gas production royalty share or other interest of the state of Louisiana from any real properties owned and leased by the state on the date of enactment of this act, the maximum lawful price under this section for any such natural gas delivered during any month shall be a price determined by arm's length negotiation, except where otherwise provided by law.

C. In the case of natural gas which was not committed or dedicated to interstate commerce on the day before the date of enactment of this Section, and which is produced on or after the date of enactment, the assistant secretary of the office of conservation shall, by rule, establish requirements and procedures to be adhered to by all producer sellers of such gas as follows:

(1) No person shall connect any intrastate natural gas pipeline with any interstate natural gas pipeline or introduce natural gas into any interstate natural gas pipeline without first obtaining a certificate of public convenience and necessity, as required by Article IX, Section 2(B) of the Louisiana Constitution, from the assistant secretary of the office of conservation.

(2) Prior to committing such natural gas to interstate commerce, a bona fide offer to sell such gas must be made to intrastate gas users or intrastate natural gas transporters, or both, as defined in L.R.S. 30:503(6) located within the state of Louisiana and capable of taking delivery thereof within a reasonable time;

(3) If the natural gas to which this Subsection is applicable was the subject of an intrastate sales contract the terms and conditions of which shall have expired after September 7, 1979: then prior to complying with the provisions of Paragraph (2) of this Subsection, the producer-seller shall, upon expiration of said contract, first offer such gas to the person who was the purchaser of such gas pursuant to the expired or terminated contract, at the same price at which the gas could be sold to any other person pursuant to an arm's length negotiation, except where otherwise provided by law, and under other terms, conditions, and circumstances as favorable as those which could be obtained for the sale of such gas by any other user in the state of Louisiana, including intrastate natural gas transporters, unless the assistant secretary of the office of conservation, after hearing, finds that the terms, conditions, or circumstances allegedly more favorable and available from another such user are of no substantial benefit to the producer-seller or are merely intended to defeat the purposes of this Subparagraph and provided that sale to such former purchaser shall not take preference over any other intrastate customer of the producer-seller who is under an existing curtailment order of the assistant secretary of the office of conservation up to the amount of the curtailment.

D. The assistant secretary of the office of conservation shall promulgate rules and regulations to be approved by the House and Senate Committees on Natural Resources, meeting jointly.

and Energy Act are applicable to Act 732.[63] Thus, the Commissioner of Conservation may seek a temporary restraining order, or a preliminary injunction to enjoin any violation of or enforce compliance with the Act.[64] Private contractual obligations will not excuse non-compliance with Act 732.[65] Substantial fines may be imposed for willful violations of Act 732 and of any rules, regulations, and orders issued thereunder.[66]

Regulation 14 was promulgated by the Louisiana Commissioner of Conservation on January 21, 1980 to implement the requirements and procedures of Act 732.[67] Regulation 14 provides in pertinent part:

"B. 7. Bona fide offer. For purposes of R.S. 30:607C(2) and this regulation, a bona fide offer shall be deemed made by a producer-seller when he causes to be published in the Official Journal of the state, the *State Times* in Baton Rouge, Louisiana, for a period of three consecutive days of publication a notice that he will entertain bids for the purchase of natural gas from intrastate natural gas transporters. Such bids must be received by the producer-seller within thirty days of the date such notice first appears in the Official Journal of the state.

\* \* \* \* \* \*

D. No producer-seller after September 7, 1979, shall dedicate natural gas to, or introduce said natural gas into interstate commerce or connect producer-seller's intrastate natural gas pipeline as defined herein with an interstate pipeline without first obtaining a certificate of public convenience and necessity issued by the Commissioner of Conservation. Said certificate may be issued by the Commissioner after public hearing, where

required by law, upon an application submitted by the producer-seller. The application shall be made in writing, verified under oath by an individual having authority to execute same and contain the following information:

\* \* \* \* \* \*

6. A statement that a bona fide offer was made pursuant to this regulation.

\* \* \* \* \* \*

E. No certificate of public convenience and necessity shall be issued to a producer-seller unless it is demonstrated at a public hearing, where required by law, that:

1. In the case of natural gas which is the subject of an intrastate sales contract that will expire subsequent to September 7, 1979, the producer-seller has first offered to sell such natural gas to the present purchaser at the same price at which the gas could be sold to any other person pursuant to arm's length negotiations, and under other terms, conditions and circumstances as favorable as those which could be obtained for the sale of such gas to any other user in the State of Louisiana, including intrastate natural gas transporters, no less than forty-five days prior to expiration of the contract;

2. In those cases where the offer provided for in paragraph (1) above has not been accepted by the present purchaser within the twenty-five day period ending twenty days prior to expiration of the contract; and the natural gas was not the subject of an intrastate sales contract; the producer-seller has made a bona fide offer to sell such natural gas to intrastate natural gas transporters and no intrastate natural gas transporter capable of

---

63. La.R.S. 30:542(C).

64. The Commissioner of Conservation may also refer evidence of any apparent violation of Act 732 to the appropriate district attorney who may institute criminal proceedings. If the Commissioner of Conservation fails to bring an action to restrain a violation within 10 days after receiving notification of the violation, any person adversely affected by the violation, who has notified the Commissioner of Conservation

of the violation or threat thereof may bring an action to restrain the violation. See La.R.S. 30:543.

65. La.R.S. 30:545.

66. La.R.S. 30:544.

67. Regulation 14 is set forth in its entirety in the appendix as Exhibit 1.

taking delivery within a reasonable time has submitted a bid at an equivalent or better price, with equivalent or better terms, conditions and circumstances, as the producer-seller could obtain by the sale of such gas in intrastate commerce."

The Commissioner of Conservation temporarily suspended the requirements of La. R.S. 30:607 subd. C (1) and (2) and paragraph D of Regulation 14 by promulgation of a Declaration of Emergency, which was approved as an amendment to Regulation 14 by the Louisiana House and Senate Committees on Natural Resources. That suspension became effective on February 29, 1980, and remained effective until June 27, 1980. By House Concurrent Resolution No. 230 of 1980, the House of Representatives and the Senate of the State of Louisiana suspended the requirements of La.R.S. 30:607 subd. C (1) and (2) and paragraph D of Regulation 14 until a final nonappealable judgment was rendered in this action or until the sixtieth (60th) day after the final adjournment [68] of the 1981 Regular Session of the Louisiana Legislature, whichever came first. On September 18, 1981, the parties herein agreed to an order restraining the enforcement of La.R.S. 30:607 subd. C (1) and (2) and paragraph D of Regulation 14 until October 9, 1981. This order was later extended to December 9, 1981.

## V. FINDINGS OF FACT

The parties have agreed or stipulated to the following Findings of Fact, which the Court hereby adopts: [69]

### 1.

Tenneco, through its division Tennessee Gas Pipeline Company, purchases, transports and sells natural gas in interstate commerce. Tenneco is a natural gas company within the meaning of section 2(6) of the NGA, 15 U.S.C. § 717a(6), and interstate pipeline within the meaning of section 2(15) of the NGPA, 15 U.S.C. § 3301(15), and is subject to regulation by the Federal Energy Regulatory Commission ("FERC") under those acts and the Department of Energy Organization Act ("DOE Act"), 42 U.S.C. § 7101, et seq. (pre-trial Order, ¶ 6(1); testimony of C.W. Brown).

### 2.

INGAA is a non-profit national trade association whose membership includes thirty one (31) interstate natural gas transmission companies, one of which is Tenneco. These members of INGAA are each subject to the regulatory jurisdiction of FERC under various provisions of the NGA, the NGPA and the DOE Act. Each is a natural gas company within the meaning of the NGA and an interstate pipeline within the meaning of the NGPA. INGAA represents its membership in matters affecting the interests of the interstate natural gas transmission industry. (Pre-trial Order, ¶ 6(2)).

### 3.

FERC is an independent regulatory commission within the Department of Energy. DOE Act § 401(a), 42 U.S.C. § 7171(a). It is responsible for administering and enforcing, inter alia, various provisions of the NGA, including the issuance of certificates of public convenience and necessity and the regulation of abandonments pursuant to section 7 of the NGA, 15 U.S.C. § 717f. It is also responsible for the administration and enforcement of the NGPA, 15 U.S.C. § 3301, et seq. NGPA §§ 501(a), 504, 15 U.S.C. §§ 3411(a), 3414. (Pre-trial Order, ¶ 6(3)).

### 4.

Defendant Raymond T. Sutton is the Commissioner of Conservation and the Assistant Secretary of the Office of Conservation of the Department of Natural Resources of the State of Louisiana. In that capacity, he has responsibility for administering and enforcing Article IX, § 2(B) of the Louisiana Constitution of 1974, as implemented by Act 732, La.R.S. 30:607. (Pre-trial Order, ¶ 6(4)).

---

**68.** The Louisiana Legislature adjourned on July 13, 1981.

**69.** See Proposed Findings of Fact and Conclusions of Law proposed by plaintiffs, intervenors and defendants and objections thereto.

**5.**

Defendant William J. Guste, Jr. is the Attorney General of the State of Louisiana. In that capacity, he is the chief legal officer of Louisiana and head of the Louisiana Department of Justice. (Pre-trial Order, ¶ 6(5)).

**6.**

The Louisiana Chemical Association is a non-profit corporation whose members are located in Louisiana and use gas for industrial purposes which is produced in Louisiana. (Pre-trial Order, ¶ 6(6)).

**7.**

Act 732 was adopted by the 1979 Regular Session of the Louisiana Legislature to implement Article IX, § 2(B) of the Louisiana Constitution of 1974 by amending the Natural Resources and Energy Act of 1973, La. R.S. 30:501, *et seq.*, to add a new section 607 relative to natural gas. Act 732 was signed by the Governor of Louisiana on July 20, 1979, and became effective on September 7, 1979. (Pre-trial Order, ¶ 6(7)).

**8.**

On September 28, 1979, defendant Sutton promulgated Interim Regulation 14 to implement the requirements and procedures of Act 732. On January 21, 1980, defendant Sutton promulgated final Regulation 14. (Pre-trial Order, ¶ 6(8)).

**9.**

Subsequent to institution of the instant litigation, defendant Sutton suspended temporarily the requirements of La.R.S. 30:607, subd. C (1) and (2) and paragraph D of Regulation 14 by promulgation of a Declaration of Emergency, which was approved as an amendment to Regulation 14 by the Louisiana House and Senate Committees on Natural Resources. That suspension became effective February 29, 1980, and remained effective until June 27, 1980. (Pre-trial Order, ¶ 6(9)).

**10.**

By House Concurrent Resolution No. 230 of 1980, the House of Representatives and the Senate of the State of Louisiana suspended the requirements of La.R.S. 30:607, subd. C (1) and (2) and paragraph D of Regulation 14 until a final nonappealable judgment is rendered in this action or until the sixtieth (60th) day after the final adjournment on July 13, 1981 of the 1981 Regular Session of the Louisiana Legislature, whichever comes first. (Pre-trial Order, ¶ 6(10)).

**11.**

Article IX, Section 2(B) of the Louisiana Constitution of 1974 provides that "[n]o intrastate natural gas pipeline or gas gathering line shall be connected with an interstate natural gas pipeline, and no interstate natural gas pipeline shall be connected with an intrastate natural gas pipeline, without a certificate of public convenience and necessity issued as provided by law after application for the connection and hearing thereon."

**12.**

Some of INGAA's members, including Tenneco and Transcontinental Gas Pipe Line Corporation ("Transco"), purchase Louisiana produced natural gas as a part of their system supplies of gas and transport that gas out of the State of Louisiana in interstate commerce for sale to various customers in other states. In the case of Tenneco approximately 2,625 miles of its interstate pipeline are located in Louisiana, or approximately 19% of its total linear miles of pipeline. It acquires a substantial part of its system supply of natural gas from gas produced within the State of Louisiana, ranging from approximately 20% of its system supply in 1976 to approximately 15% in 1980. (Testimony of C. W. Brown of Tenneco and Mario M. Garza of Transco).

**13.**

Subsequent to September 7, 1979, the effective date of the Act, Tenneco entered into approximately 39 contracts for the purchase of gas produced in Louisiana. Such contracts have resulted in the addition of approximately 230 billion cubic feet of reserves to its system supply, and approximately 106 million cubic feet a day in deliverability from its system. The producers-sellers under 32 of these contracts have commenced deliveries of gas thereunder to

Tenneco. Exhibits T–1 through T–6 and T–13 through T–15 are examples of these contracts entered into since the effective date of the Act. (Testimony of C.W. Brown of Tenneco).

Subsequent to the effective date of the Act, Tenneco entered into an agreement with Louisiana Intrastate Gas Company ("LIG"), an intrastate pipeline doing business in Louisiana, under which LIG has agreed to transport for Tenneco natural gas produced in Louisiana which has been purchased by Tenneco. Natural gas is being transported under that agreement. This transportation has necessitated interconnections between the pipelines of Tenneco and LIG. Exhibit T–11 is a correct copy of the aforementioned transportation agreement between Tenneco and LIG. Exhibit T–12 is an amendment to that transportation agreement calling for the transportation by LIG of additional volumes of gas produced in Louisiana and purchased by Tennessee. (Testimony of C.W. Brown).

### 15.

If the Act had been in effect when the necessary interconnections between the pipelines of Tenneco and LIG had been made to implement the above mentioned transportation agreement, as amended, its provisions, and the Constitutional provision and the provisions of Regulation 14 issued under the Act would have required that a certificate of public convenience and necessity be obtained from the Assistant Secretary of the Office of Conservation of the State of Louisiana before the necessary interconnections could have been made. (Testimony of C.W. Brown).

### 16.

The transportation by LIG for Tenneco of natural gas volumes produced in Louisiana as provided in Exhibits T–11 and T–12 is an activity covered by Section 311 of the NGPA, 15 U.S.C. § 3371. Authorization of FERC to conduct the transportation of Tenneco's gas under Section 311 is subject to the rules and limitations set forth in the regulations issued by FERC to implement the provisions of Section 311. (Testimony of C.W. Brown; 15 U.S.C. § 3371 and 18 C.F.R. Part 284).

### 17.

Subsequent to September 7, 1979, the effective date of the Act, Transco entered into approximately 65 contracts for the purchase for its system supply of volumes of natural gas produced in Louisiana. Approximately 24 of these contracts involved a gas well producing more than 500,000 cubic feet of gas per day. Exhibits P–1 through P–5 are among the 65 contracts mentioned above, one of these covering production from a well having daily deliverability of over 500,000 cubic feet. Deliveries of natural gas to Transco by producers-sellers under a number of these contracts have already begun. (Testimony of Mario M. Garza; Exhibits P–1 through P–5).

### 18.

Approximately 16 of the above-mentioned 65 Transco contracts were entered into during the period from September 7, 1979 to February 29, 1980. The Act was in force during that time period, and the producer-sellers complied with the provisions of the Act. Those provisions, and the provisions of Regulation 14 issued under the Act, required the issuance of a certificate of public convenience and necessity by the Assistant Secretary of the Department of Conservation of the State of Louisiana before deliveries of natural gas to Transco could commence under these gas purchase contracts. (Testimony of Mario M. Garza).

### 20.

The gas transportation activities being conducted under Exhibit P–52 are activities covered by section 311 of the NGPA, 15 U.S.C. section 3371, and authorization of such activities is required by FERC under said section 311. Such authorization is granted subject to the provisions of Part 284 of Title 18 of the Code of Federal Regulations, which set forth the requirements relative to applications, rates and charges, terms and conditions, extension of agreements, and reporting requirements. Part 284.126 of Title 18 requires that within 30 days from the commencement of such transportation activities a detailed report of

such activities be provided to FERC. Exhibit P–72 is the report provided by Transco in connection with the activities covered by Exhibit P–52. (Testimony of Mario M. Garza; 18 C.F.R. Part 284).

21.

Exhibits P–40 through P–43 are copies of orders issued by FERC granting blanket budget authority to authorize the applicant named in these orders to construct transportation facilities necessary for the interstate transportation of natural gas. Authority to regulate such interstate transportation of natural gas is vested in FERC under the provisions of section 7 of the NGA; and, Exhibits P–40 through P–43 are examples of orders issued by FERC in the exercise of such regulatory authority. (Testimony of Mario M. Garza; § 7 of the NGA, 15 U.S.C. § 717f).

22.

Since September 7, 1979, the effective date of the Act, Texas Gas Transmission Company ("Texas Gas") has engaged in activities covered by sections 311 and 312 of the NGPA, 15 U.S.C. sections 3371 and 3372, with respect to Louisiana produced natural gas that was not committed or dedicated to interstate commerce prior to September 7, 1979. Exhibits P–62 through P–66 are examples of contracts relating to such activities. Exhibits P–70 and P–71 are full reports submitted to FERC with respect to certain of those activities pursuant to Part 284.126 of Title 18 of the Code of Federal Regulations. (Joint Stipulation–1).

23.

Texas Gas is a party to existing contracts under which it is purchasing Louisiana produced natural gas that was committed or dedicated to interstate commerce on November 8, 1978, and that was finally determined to be either (1) new natural gas, (2) natural gas produced from a new, onshore production well, or (3) high cost natural gas (as those terms are defined in sections 102(c), 103(c), and 107(c) of the NGPA, 15 U.S.C. sections 3312(c), 3313(c), and 3317(c), prior to September 7, 1979. Exhibits P–73 through P–86 are examples of such contracts. (Joint Stipulation–1).

24.

Sun Gas Company ("Sun Gas") is engaged in the exploration for and production of oil and gas in approximately 12 states, including the State of Louisiana. Sun Gas now produces about 250 million cubic feet of gas per day, and the company has an interest in several substantial producing fields in the State of Louisiana. The gas produced by it in Louisiana is marketed by sales to either an intrastate pipeline purchaser or an interstate pipeline purchaser. At the present time the sales deliveries now being made by Sun Gas are approximately 50 percent to each type of gas transporter. (Testimony of James D. Olsen).

28.

Marshall Exploration Company ("Marshall") is a small producer of natural gas in Texas and in Northern Louisiana. Marshall's Louisiana production is sold under three gas contracts, with some amendments, which have been executed by Marshall with interstate pipeline purchasers. None of these contracts was executed during the effective period of the Act (September 9, 1979 through February 29, 1980). (Testimony of John T. Allison).

29.

In negotiating with potential gas purchasers for its gas production, Marshall takes into consideration the same contracting factors that are considered by Sun Gas set forth in Paragraph 25 above. (Testimony of John T. Allison).

32.

The State of Louisiana (as a plaintiff-intervenor) and the Federal Energy Regulatory Commission (as defendant) were parties in the case styled *Oklahoma v. Federal Energy Regulatory Commission*, 494 F.Supp. 636 (W.D.Okl.1980).

33.

In the *Oklahoma* case, the State of Louisiana challenged the constitutionality of the NGPA, alleging "that all provisions thereof which purport to affect intrastate gas (. . .[including section[s] 311–315) exceed the power of Congress to regulate 'commerce

among the several states;' and abrogate the Tenth Amendment, as well as being a denial of equal protection and due process." 494 F.Supp. at 643–44.

### 34.

In the instant matter, the State of Louisiana again challenges the constitutionality of the NGPA and raises arguments identical to those it urged in the *Oklahoma* litigation.

### 35.

The court in *Oklahoma v. Federal Energy Regulatory Commission,* supra, decided Louisiana's arguments regarding the constitutionality of the NGPA on the merits and held that "the NGPA and its federal regulation of intrastate gas is [sic] a legitimate exercise of Congress' power under the Commerce Clause and is [sic] not barred by the Tenth Amendment, the doctrine of intergovernmental immunity, or any other constitutional limitation." 494 F.Supp. at 658.

### 36.

The decision rendered by the district court in the *Oklahoma* case is currently on appeal to the United States Court of Appeals for the Tenth Circuit, under Docket Nos. 80–1748 and 80–1824.[70]

The Court makes the following additional findings of fact:

Since Act 732 has been enacted, no applications for introduction of gas into the interstate pipeline system have been denied. Sixty four applications were certified and approved. Only one application received an intrastate bid and that bid was not sufficient to direct the gas to the intrastate market. During the same period of time, the intrastate natural gas market has not imported any gas into Louisiana intrastate pipeline system. It is clear that industry in Louisiana is now having a difficult time competing with the interstate pipelines for the available supplies of natural gas. The price of available natural gas is a major continuing factor to this problem. Intrastate gas companies are not able to economically compete with the interstate natural gas companies for the new high cost natural gas because the intrastate lines have a smaller overall system supply at a higher weighted acquisition cost. On the other hand, interstate pipelines can acquire high cost natural gas more readily[71] with less

**70.** This decision has now been affirmed. *Oklahoma v. Federal Energy Regulatory Commission,* 494 F.Supp. 636 (W.D.Okla.1980), affirmed, 661 F.2d 832 (10 Cir. 1981).

**71.** The following information for the period April 1, 1980 through March 31, 1981 indicate the volumes of gas acquired in Louisiana, the total system supplies, and actual deliveries in Louisiana for ten interstate pipelines operating in Louisiana.

| | | |
|---|---|---|
| A. | Tennessee Gas Pipeline Company | |
| | Total system supply | 1,187,541 MMcf/year |
| | Total gas acquired in La. | 835,718 MMcf/year |
| | onshore La. | 169,343 MMcf/year |
| | offshore La. | 666,375 MMcf/year |
| | Total deliveries in La. | 324 MMcf/year |
| | (Defendants' Exhibit D–60, Schedules 1, 2 and 1–A) | |
| B. | Texas Eastern Transmission Corp. | |
| | Total system supply | 995,437 MMcf/year |
| | Total gas acquired in La. | 476,563 MMcf/year |
| | onshore La. | 58,608 MMcf/year |
| | Total deliveries in La. | 559 MMcf/year |
| | (Defendants' Exhibit D–61, Schedules 1, 2 and 1–A) | |
| C. | Trunkline Gas Company | |
| | Total system supply | 506,717 MMcf/year |
| | Total gas acquired in La. | 400,110 MMcf/year |
| | onshore La. | 84,000 MMcf/year |
| | offshore La. | 316,110 MMcf/year |
| | Total deliveries in La. | 213 MMcf/year |
| | (Defendants' Exhibit D–62, Schedules 1, 2 and 1–A) | |

impact on consumers because of their large supply base and lower weighted acquisition costs.[72] Thus, the interstate pipelines have now gained control of lost supplies of natu-

D. Florida Gas Transmission Company
 Total system supply 200,320 MMcf/year
 Total gas acquired in La. 86,434 MMcf/year
 onshore La. 35,523 MMcf/year
 offshore La. 50,911 MMcf/year
 Total gas deliveries in La. 0 MMcf/year
 (Defendants' Exhibit D–63, Schedules
 1, 2 and 1–A)

E. Michigan Wisconsin Pipeline Company
 Total system supply 643,185 MMcf/year
 Total gas acquired in La. 317,170 MMcf/year
 onshore La. not specified
 offshore La. not specified
 Total gas deliveries in La. 0 MMcf/year
 (Defendants' Exhibit D–64, Schedules
 1, 2 and 1–A)

F. Transcontinental Gas Pipeline Company
 Total system supply 984,715 MMcf/year
 Total gas acquired in La. 663,301 MMcf/year
 onshore in La. 61,202 MMcf/year
 offshore in La. 602,099 MMcf/year
 Total gas deliveries in La. 197 MMcf/year
 (Defendants' Exhibit D–65, Schedules
 1, 2 and 1–A)

G. Southern Natural Gas Company
 Total system supply 618,968 MMcf/year
 Total gas acquired in La. 377,565 MMcf/year
 onshore La. 183,098 MMcf/year
 offshore La. 194,467 MMcf/year
 Total deliveries in La. 1,970 MMcf/year
 (Defendants' Exhibit D–66, Schedules
 1, 2 and 1–A)

H. Natural Gas Pipeline Company of America
 Total system supply 1,007,147 MMcf/year
 Total gas acquired in La. 394,378 MMcf/year
 onshore La. 941 MMcf/year
 offshore La. 393,437 MMcf/year
 Total deliveries in La. 0 MMcf/year
 (Defendants' Exhibit D–67, Schedules
 1, 2 and 1–A)

I. Arkansas Louisiana Gas Company
 Total system supply 350,655 MMcf/year
 Total gas acquired in La. 64,319 MMcf/year
 onshore La. 52,719 MMcf/year
 offshore La. 11,600 MMcf/year
 Total deliveries in La. 51,401 MMcf/year
 (Defendants' Exhibit D–68, Schedules
 1, 2 and 1–A)

J. Columbia Gas Transmission Corporation
 Total system supply 1,118,315 MMcf/year
 Total gas acquired in La. . 398,996 MMcf/year
 onshore La. 177,222 MMcf/year
 offshore La. 221,774 MMcf/year
 Total deliveries in La. 0 MMcf/year
 (Defendants' Exhibit D–69, Schedules
 1, 2 and 1–A)

72. The following information for the year 1979 indicates the volumes of gas acquired system-wide and in Louisiana by twelve interstate pipelines, and the weighted average acquisition costs for that period.

A. Tennessee Gas Pipeline Company
 Total gas supply 1,153,580 MMcf at 125.56¢/mcf
 La. acquired gas 955,995 MMcf at 122.23¢/mcf
 La. offshore 751,305 MMcf at 125.57¢/mcf
 La. onshore 160,298 MMcf at 114.34¢/mcf
 (Defendants' Exhibit D–2, Page 536)

B. Southern Natural Gas Company
 Total gas supply 610,291 MMcf at 154.12¢/mcf
 La. acquired gas 478,779 MMcf at 136.64¢/mcf
 La. offshore 177,036 MMcf at 140.79¢/mcf
 La. onshore 301,743 MMcf at 134.21¢/mcf
 (Defendants' Exhibit D–29, Page 536)

C. Natural Gas Pipeline Company of America
 Total gas supply 1,066,375 MMcf at 130.68¢/mcf
 La. acquired gas 534,138 MMcf at 118.15¢/mcf
 La. offshore 132,528 MMcf at 164.76¢/mcf
 La. onshore 401,610 MMcf at 102.77¢/mcf
 (Defendants' Exhibit D–30, Page 536)

D. Michigan Wisconsin Pipeline Company
 Total gas supply 801,513 MMcf at 138.83¢/mcf
 La. acquired gas 370,919 MMcf at 109.54¢/mcf
 La. offshore 260,468 MMcf at 106.09¢/mcf
 La. onshore 110,451 MMcf at 117.67¢/mcf
 (Defendants' Exhibit D–31, Page 536)

E. Florida Gas Transmission Company
 Total gas supply 172,998 MMcf at 135.41¢/mcf
 La. acquired gas 114,568 MMcf at 128.38¢/mcf
 La. offshore 0
 La. onshore 114,680 MMcf at 128.38¢/mcf
 (Defendants' Exhibit D–32, Page 536)

F. Mid Louisiana Gas Company
 Total gas supply 24,369 MMcf at 169.97¢/mcf
 La. acquired gas 23,866 MMcf at 169.62¢/mcf
 La. offshore 5,412 MMcf at 153.44¢/mcf
 La. onshore 18,454 MMcf at 174.37¢/mcf
 (Defendants' Exhibit D–33, Page 536)

G. Mississippi River Transmission Corporation
 Total gas supply 233,485 MMcf at 178.43¢/mcf
 La. acquired gas 140,834 MMcf at 183.49¢/mcf
 La. offshore 0
 La. onshore 140,834 MMcf at 183.49¢/mcf
 (Defendants' Exhibit D–34, Page 536)

H. Texas Eastern Transmission Corporation
 Total gas supply 943,499 MMcf at 111.20¢/mcf
 La. acquired gas 567,343 MMcf at 90.47¢/mcf
 La. offshore 133,457 MMcf at 135.95¢/mcf
 La. onshore 433,886 MMcf at 76.48¢/mcf
 (Defendants' Exhibit D–35, Page 536)

I. Trunkline Gas Company
 Total gas supply 511,694 MMcf at 138.05¢/mcf
 La. acquired gas 356,571 MMcf at 130.26¢/mcf
 La. offshore 293,116 MMcf at 137.94¢/mcf
 La. onshore 63,455 MMcf at 94.79¢/mcf
 (Defendants' Exhibit D–36, Page 536)

J. Transcontinental Gas Pipeline Company
 Total gas supply 740,430 MMcf at 129.25¢/mcf
 La. acquired gas 521,236 MMcf at 127.23¢/mcf
 La. offshore 468,039 MMcf at 128.63¢/mcf
 La. onshore 53,197 MMcf at 114.92¢/mcf
 (Defendants' Exhibit D–37, Page 536)

K. Arkansas Louisiana Gas Company
 Total gas supply 307,567 MMcf at 117.15¢/mcf
 La. acquired gas 64,418 MMcf at 144.32¢/mcf

ral gas at prices much lower than that now being produced. These lines now have the ability to mix the higher and lower priced gas and to average the cost of the two at the point of sale. There are no reserves of "old gas" in the intrastate lines to mix with the high cost natural gas. Thus, the price of gas from the intrastate pipeline carrier is higher. Users, therefore, in Louisiana not only have to be concerned with the price of gas, but also the availability of gas. In 1970, South Louisiana, an area including both the onshore and offshore area adjacent to Louisiana, was responsible for the production of approximately 33% of domestic natural gas production. In 1979, Louisiana ranked third in net consumption of natural gas after Texas and California. Louisiana also ranks high among consuming states which have been curtailed by interstate pipelines. In 1976, Louisiana led the nation in curtailments. In spite of its high production, Louisiana must still import gas to satisfy its industry's heavy dependence on that source of fuel. Producers of natural gas in Louisiana prefer to sell their gas to interstate pipelines because the interstate pipelines can take larger quantities of gas or pay for it if they do not take it, can enter into longer term contracts, and more favorable terms can be secured in contracts with interstate pipelines. The passage of the NGPA has encouraged a situation where Louisiana intrastate pipelines are not able to compete on an equal footing with the interstate pipelines. This conclusion is based in part on the problem which Louisiana Resources Company (LCR) is encountering in having a supply deficit of one-fifth of its total deliverability of gas. This downward trend began in 1979 after the passage of the NGPA and is expected to continue. LRC has been unsuccessful in obtaining new supplies of gas in the past

two years, and, in fact, has acquired less gas in that period of time than in the six months preceding the passage of the NGPA. Even where the intrastate consumer can compete with the interstate pipeline with regard to contract terms, the intrastate consumer will not be able to meet the new high price which must be charged. The evidence presented herein revealed that Litton Industry's Valentine Paper Mill in South Louisiana had previously been served by Monterrey Pipeline Company, an intrastate pipeline. When its contract expired, Litton was offered a new contract at a higher price which Litton could not accept. With deregulation proceeding as scheduled under the NGPA, the situation for intrastate pipelines and consumers can only get worse.

## VI. CONSIDERATION OF THE LEGAL ISSUES PRESENTED

### A. IS THERE A CASE OR CONTROVERSY FOR THE COURT TO DECIDE?

 The defendants contend that there is no case or controversy for the Court to decide. This contention is without merit. In essence, defendants' argument addresses itself to the merits of the lawsuit and not to the existence of a "case or controversy". The contentions raised by the parties regarding the constitutionality of the applicable federal and state acts involved in this suit does present a "case or controversy" for the Court to decide. *Blanchette v. Connecticut General Ins. Corps.*, 419 U.S. 102, 95 S.Ct. 335, 42 L.Ed.2d 320 (1974); *Pennsylvania v. West Virginia*, 262 U.S. 553, 43 S.Ct. 658, 67 L.Ed. 1117 (1923).

| | |
|---|---|
| La. offshore | 9,767 MMcf at 194.59¢/mcf |
| La. onshore | 54,651 MMcf at 135.34¢/mcf |
| (Defendants' Exhibit D–38, Page 536) | |
| L. United Gas Pipeline Company | |
| Total gas supply | 950,406 MMcf at 161.09¢/mcf |
| La. acquired gas | 701,174 MMcf at 152.97¢/mcf |
| La. offshore | 136,376 MMcf at 150.17¢/mcf |
| La. onshore | 564,798 MMcf at 153.64¢/mcf |
| (Defendants' Exhibit D–39, Page 536) | |

B. IS THE NGPA UNCONSTITUTIONAL AND IS THE DECISION RENDERED IN STATE OF OKLAHOMA, ET AL. v. FEDERAL ENERGY REGULATORY COMMISSION, SUPRA, BINDING ON THE DEFENDANTS UNDER THE DOCTRINE OF RES JUDICATA?

█ Defendants further contend that the NGPA is unconstitutional because: (1) it exceeds the authority of Congress under the Commerce Clause; (2) it violates the provisions of the Tenth Amendment of the United States Constitution; and (3) it violates the Intergovernmental Immunities Doctrine of the United States Constitution. The constitutionality of the NGPA has recently been upheld by the United States District Court for the Western District of Oklahoma and the Tenth Circuit Court of Appeals. *State of Oklahoma et al. v. Federal Energy Regulatory Commission*, supra. The Court finds that the decision rendered in *State of Oklahoma, et al. v. Federal Energy Regulatory Commission*, supra, is binding on the defendants herein under the doctrine of res judicata. *Commissioner of Internal Revenue v. Sunnen*, 333 U.S. 591, 68 S.Ct. 715, 92 L.Ed. 898 (1948); *Brown v. Felsen*, 442 U.S. 127, 99 S.Ct. 2205, 60 L.Ed.2d 767 (1979). Thus, no extended discussion is required by this Court on the constitutionality of the NGPA since this issue was fully and adequately analyzed and discussed by both the District Court and the Court of Appeals in the State of Oklahoma case. In affirming the decision of the trial court, the Court of Appeals stated:

"In granting summary judgment in favor of FERC and upholding the constitutionality of the Act in all respects, the trial court found/concluded, *inter alia*: Congress may regulate activities which are wholly intrastate when the intrastate activity either has a substantial economic effect on interstate commerce or where federal regulation of the intrastate activity is necessary to effectuate the interstate regulation; in assessing a challenge to Congress' regulation of intrastate commerce a court must determine whether Congress had a rational basis for determining that the unregulated intrastate gas market affected interstate commerce and, if so, whether the means selected by Congress were reasonably adapted to eliminating the burden; Congress had a rational basis for determining that the unregulated intrastate market imposed a burden on interstate commerce; the regulatory scheme adopted by Congress is reasonably adopted to eliminating the burden on interstate commerce; the enactment of the Act was within the constitutional congressional power; the enactment of the Act was not in violation of the constitutional doctrine of intergovernmental immunity; the States have failed to establish that the implementation of the Act will severely reduce state revenues; the power to regulate natural gas is not a traditional state function from which Congress is prohibited from interfering; Congress may pre-empt state conservation regulations which interfere with or burden interstate commerce; Congress may delegate certain administrative duties to administrative agencies, federal or state; the States, while authorized to administer the Act, are not coerced into administering the Act since no sanctions are levied in the event a state agency refuses to act; although the Act does impose both revenue reducing regulations and the cost of their administration upon certain natural gas producing states, there can be no violation of the Tenth Amendment or equal footing doctrine, inasmuch as the Act does not command any State action, and the States are free to refuse to act, thus avoiding payment for administration.

\* \* \* \* \* \*

We hold that the District Court properly concluded that Congress acted within its power in enacting legislation to effectuate setting maximum prices on intrastate gas and that such pricing is not prohibited by the doctrine of intergovernmental immunity. In our view, the District Court's analysis in assessing the validity of Congress' enactment of the NGPA vis-a-vis a constitutional challenge

predicated on the legal efficacy of the Commerce Clause, closely parallels a similar discussion in *Hodel v. Virginia Surface Mining*, 452 U.S. 264, 101 S.Ct. 2352, 69 L.Ed.2d 1 (1981).

\* \* \* \* \* \*

Here, as in *Hodel v. Virginia*, the District Court properly deferred to the express findings of Congress relative to the effects of the intrastate gas market on interstate commerce. Furthermore, here, as in *Hodel v. Virginia*, the District Court likewise considered 'the only remaining question for judicial inquiry', *i.e.*, whether 'the means chosen by [Congress] is reasonably adapted to the end permitted by the constitution.'

States' burden of establishing that the means selected by Congress was not reasonably adapted to the end permitted by the Constitution is a heavy one which States have failed to meet.

\* \* \* \* \* \*

We hold that the District Court properly found/concluded that the enactment of NGPA is a constitutionally acceptable exercise of Congress' Commerce Clause power. We also hold that the District Court correctly found that the maximum pricing provisions of the Act are not prohibited by the constitutional doctrine of intergovernmental immunity. *See National League of Cities v. Usery*, 426 U.S. 833 (1976) at p.851 [96 S.Ct. 2465, 49 L.Ed.2d 245].

\* \* \* \* \* \*

As in *Hodel v. Virginia*, the NGPA simply allows the states to participate in the administration of the Act. There, as here, '[i]f a States does not wish to submit a proposed permanent program . . . , the full regulatory burden will be borne by the Federal Government.' In view of the right of Congress to displace or preempt state laws regulating private activity affecting interstate commerce when they conflict with federal laws, we hold that the District Court correctly found that the Act is not in violation or degra-

dation of States' Tenth Amendment right."

For the reasons set forth in the opinion of the District Court and the Court of Appeals in the State of Oklahoma case, this Court finds that the decision upholding the constitutionality of the NGPA is binding on this Court in this case.

## C. DO ARTICLE IX, SECTION 2(B) OF THE LOUISIANA CONSTITUTION, ACT 732 AND REGULATION 14 VIOLATE THE SUPREMACY CLAUSE OF THE UNITED STATES CONSTITUTION?

■ One of the most important issues in this case is whether Article IX, § 2(B), Act 732 and Regulation 14 violate the Supremacy Clause of the United States Constitution[73] because they establish a regulatory scheme which directly conflicts with the provisions, regulatory scheme and intent of the NGA and the NGPA. Acts of the state which interfere with, or are contrary to the laws of Congress, made in pursuance of the Constitution are invalid under the Supremacy Clause. *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 4 L.Ed. 579 (1819); *Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1, 6 L.Ed. 23 (1824); *Hines v. Davidowitz*, 312 U.S. 52, 61 S.Ct. 399, 85 L.Ed. 581 (1941).

■ In determining whether a state statute is in conflict with a federal statute and thus invalid under the Supremacy Clause, the Court must first ascertain the construction of the two statutes and then resolve the constitutional question of whether they are in conflict. *Perez v. Campbell*, 402 U.S. 637, 91 S.Ct. 1704, 29 L.Ed.2d 233 (1971). In the final analysis, the Court's function "is to determine whether a challenged state statute 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Hines v. Davidowitz*, supra, 61 S.Ct. at 404. Thus, where a state and the Congress enact similar legislation, the Court must review the history and purpose of the federal regulation to determine

**73.** Article VI, Clause 2 of the United States Constitution.

whether the Congress intended to pre-empt the state legislation and regulate the area in question. In determining this congressional intent, the Court may consider the following factors which were set forth by the United States Supreme Court in *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 67 S.Ct. 1146, 91 L.Ed. 1447 (1947):

> "Such a purpose [to displace state law] may be evidenced in several ways. The scheme of federal regulation may be so pervasive as to make reasonable the inference that Congress left no room for States to supplement it. * * * Or the Act of Congress may touch a field in which the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject. * * * Likewise, the object sought to be obtained by the federal law and the character of obligations imposed by it may reveal the same purpose. * * * Or the state policy may produce a result inconsistent with the objective of the federal statute." 67 S.Ct. at 1152. (citations omitted)

Therefore, a state statute is void to the extent that it conflicts with a federal statute and "compliance with both federal and state regulations is a physical impossibility," *Florida Lime and Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142–143, 83 S.Ct. 1210, 1217, 10 L.Ed.2d 248 (1963), or where the state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hines v. Davidowitz*, supra.[74]

The plaintiffs and intervenors contend that the Louisiana enactments (1) conflict on their face with the purpose and objectives of the NGA and the NGPA; (2) are in direct conflict with several specific provisions of the NGPA which are designed to encourage the introduction of new gas into interstate commerce; and (3) there is a physical impossibility of complying with Act 732 and Section 315 of the NGPA. The defendants, on the other hand, contend that the Louisiana enactments do not violate the Supremacy Clause.

Through the enactment of the NGA and the NGPA, Congress has expressed its intent to establish a regulatory scheme to provide adequate supplies of natural gas to the interstate market.[75] To accomplish its goals, Congress has delegated certain power and authority to FERC. The United States Supreme Court has consistently upheld the authority which Congress has granted to FERC under the NGA[76] to implement the Act and to maintain adequate supplies of natural gas for the interstate market. The first decision was rendered by the Supreme Court shortly after the NGA was enacted. Thus, in *Illinois Natural Gas Co. v. Central Illinois Pub. Serv. Co.*, 314 U.S. 498, 62 S.Ct. 384, 86 L.Ed. 371 (1942), the Supreme Court held that an order issued by the Illinois Commerce Commission directing a natural gas pipeline company to supply a local distributor with gas for distribution to consumers in Illinois was invalid. The Court stated:

> "We think it plain that these provisions, read in the light of the legislative history,

---

**74.** See generally, *Ray v. Atlantic Richfield Co.*, 435 U.S. 151, 98 S.Ct. 988, 55 L.Ed.2d 179 (1978); *City of Burbank v. Lockheed Air Terminal, Inc.*, 411 U.S. 624, 93 S.Ct. 1854, 36 L.Ed.2d 547 (1973); *State of Maryland v. State of Louisiana*, 451 U.S. 725, 101 S.Ct. 2114, 68 L.Ed.2d 576 (1981).

**75.** In enacting the NGA, Congress declared that "the business of transporting and selling natural gas for ultimate distribution to the public is affected with a public interest, and that Federal regulation in matters relating to the transportation of natural gas and the sale thereof in interstate and foreign commerce is necessary in the public interest." 15 U.S.C. § 717(a).

**76.** 15 U.S.C. § 717f(c) prohibits any person from selling or transporting natural gas in interstate commerce without first obtaining a certificate of public convenience and necessity from the FERC. 15 U.S.C. § 717f(e) grants FERC the authority to "... attach to the issuance of the certificate and to the exercise of the rights granted thereunder such reasonable terms and conditions as the public convenience and necessity may require." 15 U.S.C. § 717f(b) prohibits the termination of jurisdictional service without the prior approval of the FERC.

were intended to bring under federal regulation wholesale distribution, like that of appellant, of gas moving interstate. * *

As Congress, by § 7(a)(c) of the Act has given plenary authority to the Federal Commission to regulate extensions of gas transportation facilities and their physical connection with those of distributors, as well as the sale of gas to them, and since no certificate of public convenience and necessity, required by § 7(c), has been granted to appellant by the Federal Commission for the proposed extensions and sale, the state commission was without power to order them."
62 S.Ct. at 388–389.

Later, in *Atlantic Refining Co. v. Public Service Commission of New York*, 360 U.S. 378, 79 S.Ct. 1246, 3 L.Ed.2d 1312 (1959), the Supreme Court reaffirmed the power of FERC to carry out the responsibility of the NGA.[77] In later cases decided by the United States Supreme Court, the Court continued to uphold the authority of FERC to implement the provisions of the NGA. See *Sunray Mid-Continent Oil Co. v. Federal Power Commission*, 364 U.S. 137, 80 S.Ct. 1392, 4 L.Ed.2d 1623 (1960); *United Gas Pipeline Co. v. Federal Power Commission*, 385 U.S. 83, 87 S.Ct. 265, 17 L.Ed.2d 181 (1966); *California v. Southland Royalty Co.*, 436 U.S. 519, 98 S.Ct. 1955, 56 L.Ed.2d 505 (1978); *United Gas Pipeline Co. v. McCombs*, 442 U.S. 529, 99 S.Ct. 2461, 61 L.Ed.2d 54 (1979).[78] The Supreme Court has also upheld the authority of FERC to establish a pricing system for old and new natural gas, *In Re Permian Basin Rate Cases*, 390 U.S. 747, 88 S.Ct. 1344, 20

L.Ed.2d 312 (1968), and for establishing a dual price system for large and small producers. *Federal Power Commission v. Texaco, Inc.*, 417 U.S. 380, 94 S.Ct. 2315, 41 L.Ed.2d 141 (1974). See also, *Southern Louisiana Area Rate Cases v. Federal Power Commission*, 428 F.2d 407 (1970), cert. denied, 400 U.S. 950, 91 S.Ct. 243, 27 L.Ed.2d 257 (1970).[79]

██ In enacting the NGA Congress intended to create a comprehensive and effective regulatory scheme which would occupy the field to the exclusion of state regulation. *Federal Power Commission v. Louisiana Power & Light Co.*, 406 U.S. 621, 92 S.Ct. 1827, 32 L.Ed.2d 369 (1972); *Panhandle Eastern Pipe Line Company v. Public Service Comm'n of Indiana*, 332 U.S. 507, 68 S.Ct. 190, 92 L.Ed. 128 (1947); *Public Utilities Comm'n v. United Fuel Gas Co.*, 317 U.S. 456, 63 S.Ct. 369, 87 L.Ed. 396 (1943); *Cities Service Gas Co. v. Peerless Oil & Gas Co.*, 340 U.S. 179, 71 S.Ct. 215, 95 L.Ed. 190 (1950); *Phillips Petroleum Co. v. State of Wisconsin*, 347 U.S. 672, 74 S.Ct. 794, 98 L.Ed. 1035 (1954); *Natural Gas Pipeline Co. of American v. Panoma Corp.*, 349 U.S. 44, 75 S.Ct. 576, 99 L.Ed. 866 (1955); *Cities Service Co. v. State Corporation Commission of Kansas*, 355 U.S. 391, 78 S.Ct. 381, 2 L.Ed.2d 355 (1958).

The exclusive regulatory scheme mandated by the Congress in this area has been upheld by the Supreme Court where the state attempted to enact legislation which conflicted with the federal policies. Thus, in *Northern Natural Gas Co. v. State Corporation Commission of Kansas*, 372 U.S.

---

**77.** In deciding this case, the Supreme Court noted that one of the main purposes of the NGA was to provide natural gas in interstate commerce for resale "at the lowest possible reasonable rate consistent with the maintenance of adequate service..." *Id.* 79 S.Ct. at 1253.

**78.** In this case the court stated "[w]e have consistently recognized that the Commission's 'legal control over the continuation of service,' *Sunray*, supra, 364 U.S., at 158 N.25, 80 S.Ct. at 1404 N.25 is a fundamental component of the regulatory scheme. To deprive the Commission of this authority, even in limited circum-

stances, would conflict with basic policies underlying the Act." 99 S.Ct. at 2427.

**79.** There has been considerable debate regarding the various pricing systems used for old and new gas. There has also been much discussion regarding the complete deregulation of natural gas. The Court in no way suggests that the current pricing procedures adopted and implemented by FERC are the correct procedures to be used. The question of whether there should be complete deregulation is a matter for the Congress and not for the Court.

84, 83 S.Ct. 646, 9 L.Ed.2d 601 (1963), the court invalidated a state regulation which required interstate pipeline companies to purchase gas ratably from all wells connecting with its pipeline system on the grounds that the state regulation improperly invaded the jurisdiction of FERC.[80] The Court stated:

"The Kansas Supreme Court also sustained the orders on the ground that neither order threatened any actual invasion of the regulatory domain of the Federal Power Commission since it 'in no way involves the price of gas.' 188 Kan. at 624, 364 P.2d, at 668. It is true that it was settled even before the passage of the Natural Gas Act, that direct regulation of the prices of wholesales of natural gas in interstate commerce beyond the constitutional power of the States— whether or not the ambit of state power. * * * But our inquiry is not at an end because the orders do not deal in terms with prices or volumes of purchases, * *

The Natural Gas Act precludes not merely direct regulation by the States of such contractual matters. * * * The Congress enacted a comprehensive scheme of federal regulation of 'all wholesale of natural gas in interstate commerce, whether by a pipeline company or not and whether occurring before, during, or after transmission by an interstate pipeline company."

* * * * * *

"The federal regulatory scheme leaves no room either for direct state regulation of the prices of interstate wholesales of natural gas, * * * or for state regulations which would indirectly achieve the same result. [footnote omitted.] These state orders necessarily deal with matters which directly affect the ability of the

Federal Power Commission to regulate comprehensively and effectively the transportation and sale of natural gas, and to achieve the uniformity of regulation which was an objective of the Natural Gas Act. They therefore invalidly invade the federal agency's exclusive domain." [citations omitted.]

See also: *Federal Power Commission v. Hope Natural Gas Co.*, 320 U.S. 591, 64 S.Ct. 281, 88 L.Ed. 333 (1944); *Federal Power Commission v. Louisiana Power and Light Co.*, 406 U.S. 621, 92 S.Ct. 1827, 32 L.Ed.2d 369 (1972).

In *Public Service Commission of Kentucky v. Federal Energy Regulatory Commission*, 610 F.2d 439 (6 Cir. 1979) the Kentucky Public Service Commission filed suit to determine whether FERC had the authority to require a certificate of public convenience and necessity prior to the interconnection of an interstate pipeline with an intrastate pipeline serving local Kentucky consumers. The court held that FERC jurisdiction prevailed and that the orders of FERC must be complied with notwithstanding the provisions of the Kentucky law. The Court stated:

"[1] The Natural Gas Act was the product of a congressional desire to assure an adequate, reliable and reasonably-priced supply of natural gas for the entire nation. [footnote omitted] Congress sought to achieve this objective by creating a comprehensive regulatory framework [footnote omitted] through which, among other things, the movement of natural gas through the interstate pipelines could be coordinated. In borderline cases involving the respective ambits of state and federal regulatory authority, therefore, courts ask whether it is within the capability of states to

---

**80.** The State of Kansas also argued that the order was a proper exercise of state power over conservation of natural gas. The Supreme Court rejected this argument stating "[T]here is not doubt that the States do possess power to allocate and conserve scarce natural resources upon and beneath their lands. We have recognized such power with particular respect to natural gas ... [b]ut the problem of this case is not as to the existence or even the scope of a State's power to conserve its natural resources; the problem is only whether the Constitution sanctions the particular means chosen by Kansas to exercise the conceded power if those means threatened effectuation of the federal regulatory scheme." 83 S.Ct. at 651–652, 372 U.S. at 93.

regulate in accordance with the purposes of the Natural Gas Act. [footnote omitted] If practicable regulation exceeds the competence of the state governments, courts can preserve the efficacy of the Natural Gas Act only by determining that federal authority prevails. [footnote omitted]

[2] The inability of the states to regulate effectively the nationwide allocation of natural gas supplies, as attempted in part by Kentucky here, is apparent. The Kentucky law seeks to reserve a supply of natural gas to certain state residents. The statutory plan, independent of federal regulatory control, denies to consumers outside of Kentucky and to Kentuckians whose real estate lies beyond one-half mile of wellheads and gathering lines the equal access that they otherwise would enjoy to Kentucky natural gas. If pursued by many or all producing states in times of extraordinary scarcity, the Kentucky policy would impede, if not prohibit altogether, accomplishment of the congressional desire to provide an adequate supply of natural gas for the entire nation.

The need for paramount federal authority here is compelling. As the Supreme Court noted in *FDC v. Louisiana Power & Light Co.*, the 'state agency . . . would be obliged to regulate in the State, not the national interest.' [footnote omitted] Indeed, the 'unavoidable conflict between producing States and consuming States' makes 'the desirability of uniform federal regulation . . . abundantly clear.' " [footnote omitted] 610 F.2d, 442–444.

See also *Backus v. Panhandle Eastern Pipe Line Co.*, 558 F.2d 1373 (10 Cir. 1977). ▮▮▮▮ Considering the legislative history and purposes of the NGA, the NGPA and the Louisiana constitutional provision and statute involved in this case and the jurisprudence, the Court finds that Article IX, § 2(B) of the Louisiana Constitution,

Act 732 and Regulation 14 violate and conflict with the Supremacy Clause of the United States Constitution and, therefore, are invalid. It is clear that the "Gas Act was intended to provide the FPC, now the FERC, with authority to regulate the wholesale pricing of natural gas in the flow of interstate commerce from wellhead to delivery to consumers." *Maryland v. Louisiana*, 451 U.S. 725, 748, 101 S.Ct. 2114, 2130, 68 L.Ed.2d 576 (1981).[81] Cf. *Phillips Petroleum Co. v. Wisconsin*, 347 U.S. 672, 74 S.Ct. 794, 98 L.Ed. 1035 (1954). The NGPA "was enacted to alleviate the adverse economic effects of the disparate treatment of intrastate and interstate natural gas sales." *Maryland v. Louisiana*, supra, 451 U.S. at 747, n.22, 101 S.Ct. at 2129, n.22. This Court has previously discussed the history and purpose of the NGA and the NGPA in part IV (B) and (C) of this opinion.[82] There is no need to repeat this extended discussion in detail. The history, purpose and intent of Act 732 are also clear. It was the hope and intent of the Louisiana Legislature that Act 732 would give Louisiana users first priority at obtaining new natural gas that may be found in the state. Louisiana also hoped to provide Louisiana intrastate users the same protection which the federal government through the FERC, was giving to interstate users under the NGA and the NGPA. It is clear that Article IX, § 2(B), Act 732 and Regulation 14 conflict with the purpose and objectives of the NGA and the NGPA and are in direct conflict with specific provisions of the NGPA.

▮▮▮▮ The NGA and the NGPA were passed by the Congress to provide an adequate and reasonably priced supply of natural gas for the entire nation with equal access to both the intrastate and interstate markets. In enacting this federal regulatory scheme, Congress intended to pre-empt the field of regulating natural gas. Congress' expressed objectives, moreover, involve "a federal interest . . . so dominant

---

81. In *Maryland v. Louisiana*, supra, the United States Supreme Court declared Louisiana's first use tax on natural gas to be unconstitutional under the Supremacy Clause.

82. See pages 432–438 of this opinion.

438

that the federal interest will be assumed to preclude enforcement of state laws on the same subject" *Rice v. Santa Fe Elevator Co.,* supra, 67 S.Ct. at 1152. Cf. *Ray v. Atlantic Richfield Co.,* 435 U.S. 151, 98 S.Ct. 988, 55 L.Ed.2d 179 (1978); *Northern Gas Co. v. Kansas Corporation Commission,* 372 U.S. 84, 83 S.Ct. 646, 9 L.Ed.2d 601 (1963). Furthermore the federal interest in the regulation of natural gas "is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject." *Rice v. Santa Fe Elevator Co.,* supra, 67 S.Ct. at 1152. *Hines v. Davidowitz,* supra. The Louisiana enactments clearly stand "as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Id.,* 61 S.Ct. at 404. If the Louisiana enactments were upheld, "the congressional desire to provide an adequate supply of gas for the entire nation" would be frustrated. *Public Service Commission of Kentucky v. FERC,* supra, 610 F.2d at 443.

More specifically, Article IX, § 2(B) and Act 732 conflict with the purpose and objectives of the NGA and NGPA because the Louisiana enactments: (1) grant preferential treatment to Louisiana users and consumers;[83] and (2) impose regulatory burdens on producers which the Congress eliminated in the NGPA.[84]

In addition to conflicting with the purposes and objectives of the NGA and NGPA, the Louisiana enactments also directly conflict with Sections 311 and 312 of the NGPA.[85] Sections 311 and 312 were enacted by the Congress to encourage the introduction of new natural gas into interstate commerce. Section 311 allows an intrastate pipeline to sell gas to interstate pipelines without permanently subjecting

the intrastate line to FERC jurisdiction. Intrastate pipelines are also permitted under Section 311 to transport natural gas for interstate pipelines and vice-versa without the need of obtaining the certificate required by the NGA. Louisiana also seeks to regulate these same transactions and requires a certificate to be obtained from the appropriate state agency prior to the connection of the pipelines and prior to the introduction of any gas into the interstate pipeline system.

Section 312 of the NGPA allows FERC to prescribe rules for the assignment of purchase contracts by an intrastate pipeline to an interstate line.[86] Louisiana, on the other hand, requires that the gas be offered to intrastate purchasers first and that its regulatory agency approve any assignment before it is implemented. Such requirements by Louisiana exceed the authority granted to states under Section 312 of the NGPA.

The plaintiffs and intervenors also contend that there is a physical impossibility of complying with Act 732 and Section 315 of the NGPA at the same time. In view of the Court's ruling above, it is not necessary for the Court to rule on this contention.

Therefore, for the reasons set forth above the Court finds that Article IX § 2(B), Act 732 and Regulation 14 are invalid and unconstitutional under the Supremacy Clause of the United States Constitution.

D. DO ARTICLE IX, SECTION 2(B) OF THE LOUISIANA CONSTITUTION, ACT 732 AND REGULATION 14 VIOLATE THE COMMERCE CLAUSE OF THE UNITED STATES CONSTITUTION?

Although the Court has held that the state enactments are invalid because they

---

**83.** R.S. 30:607, subd. C(2) provides that before selling in interstate commerce any gas produced in Louisiana that was not committed or dedicated to interstate commerce before the effective date of Act 732, the seller must make "a bona fide offer to sell such gas . . . to intrastate natural gas transporters . . . located within . . . Louisiana."

**84.** R.S. 30:607, subd. C(1) requires producers desiring to sell new supplies of natural gas in interstate commerce to obtain a certificate to

do so from the State of Louisiana. This provision of Act 732 requires producers desiring to sell new supplies of natural gas in interstate commerce to comply with regulatory burdens which the Congress has removed with the passage of the NGPA

**85.** 15 U.S.C. § 3371 and 15 U.S.C. § 3372.

**86.** § 312 does not apply to sales but only to assignment of purchase contracts.

violate the Supremacy Clause of the United States Constitution, the Court, out of an abundance of caution and in the interest of judicial economy, will also determine whether these same state provisions violate the Commerce Clause of the United States Constitution.

■ The plaintiff and intervenor have challenged the constitutionality of the state enactments on the ground that they violate Article I § 8 Clause 3 of the United States Constitution, generally known as the Commerce Clause. Historically, the courts have found the Commerce Clause to not only be a grant of power to the federal government, but a limit on state action as well. *H. P. Hood & Sons, Inc. v. DuMond*, 336 U.S. 525, 69 S.Ct. 657, 93 L.Ed. 865 (1949). The Commerce Clause does not absolutely forbid statutes regulating interstate commerce but, such regulation by the state cannot operate to unconstitutionally burden interstate commerce.

■ The Louisiana enactments seek to regulate the transportation and use of natural gas found within the state of Louisiana. It is clear that natural gas is an article of commerce. "Gas, when reduced to possession, is a commodity; it belongs to the owner of the land; ... and may be subject of both intrastate and interstate commerce." *West v. Kansas Natural Gas Company*, 221 U.S. 229, 31 S.Ct. 564, 571, 55 L.Ed. 716 (1911). The fact that the natural gas regulated by the State of Louisiana is still within the state does not mean that this gas is not an article subject to regulation by the Commerce Clause. Thus, in *Commonwealth of Pennsylvania v. State of West Virginia*, 262 U.S. 553, 43 S.Ct. 658, 67 L.Ed. 1117 (1923) the United States Supreme Court stated:

> "Natural gas is a lawful article of commerce, and its transmission from one state to another for sale and consumption in the latter is interstate commerce. A state law, whether of the state where the gas is produced or that where it is to be sold, which by its necessary operation prevents, obstructs or burdens such transmission is a regulation of interstate commerce..." 43 S.Ct. at 665.

Since the Louisiana enactments are an attempt by Louisiana to regulate a commodity which may become a part of interstate commerce, the Court must determine whether such regulation is permissible under the Commerce Clause.

■ The appropriate test for determining whether a state statute affecting interstate commerce is valid is set forth in *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970), wherein the Court set forth the following factors for the Court to consider:

(1) Does the statute regulate evenhandedly with an incidental effect on interstate commerce?

(2) Does it promote a legitimate local purpose?

(3) Is the burden on interstate commerce excessive when balanced against local benefits and is some less burdensome alternative available?

■ The first inquiry under the above test is whether the state regulates commerce evenhandedly. If a state statute discriminates against interstate commerce on its face, such discrimination invokes the strictest scrutiny of any purported legitimate local purpose. Such discrimination may of itself be a fatal defect. *Hughes v. Oklahoma*, 441 U.S. 322, 99 S.Ct. 1727, 60 L.Ed.2d 250 (1979). It is difficult to avoid the conclusion that the Louisiana enactments involved herein discriminate against interstate commerce. By requiring a certificate of public convenience and necessity from interstate purchasers and by requiring that intrastate purchasers be given the first opportunity to purchase natural gas before the gas is offered to interstate pipelines, the Louisiana enactments are discriminatory on their face.

■ The enactments also discriminate against interstate commerce in a practical effect. By requiring that gas be offered to intrastate purchasers initially, the flow of natural gas into interstate markets is delayed pending offers, negotiations, and rejections by intrastate purchasers. Addi-

**440**

tionally, if the intrastate dealer agrees to purchase the gas, the interstate market is completely cut off. The interstate purchaser does not have the same opportunity to buy a commodity destined for interstate commerce as an intrastate purchaser does. In fact, if the gas is bought intrastate, the interstate dealer has no opportunity to buy the gas. States may not discriminate against interstate commerce by the erection of these types of trade barriers. "A state law whether of the state where the gas is produced or that where it is to be sold, which by its necessary operation prevents, obstructs or burdens such transmission is a regulation of interstate commerce—a prohibited interference." *Commonwealth of Pennsylvania v. State of West Virginia*, supra, 43 S.Ct. at 665. The fact that the enactments apply only to gas not already committed to interstate commerce on the day before their enactment does not prevent the enactments from being discriminatory. Under the Louisiana legislation, "new gas" would either be delayed or totally prevented from entering the interstate commerce. The legislative enactments discriminate against interstate purchasers by giving intrastate dealers a first chance to commit such "new gas" to the intrastate market. Therefore, the Louisiana enactments discriminate against interstate commerce both on their face and in practical effect.

 Since the enactments do discriminate against interstate commerce, the State of Louisiana must make a very strong showing of a legitimate state purpose in order for the Court to uphold the validity of the enactments. The purpose of the Louisiana enactments is clear from reviewing the legislative history of the provisions and from the evidence presented at the trial.

Louisiana hopes to protect local users and purchasers by providing that they be offered the first right to buy natural gas before it is offered to interstate users. Present day fuel costs, dwindling resources, and the desire to protect Louisiana industry and consumers motivated the Louisiana legislature to protect its residents from potential natural gas shortages.[87] However, regardless of the legislature's intent to protect its own citizens, the actions of the Louisiana legislature cannot be supported as a valid local purpose under the Commerce Clause. Economic protectionism has long been regarded as an impermissible state goal. A state cannot seek to isolate itself economically by burdening interstate commerce. *H. P. Hood & Sons, Inc. v. DuMond*, supra. Nor may a state attempt to isolate itself from a problem common to many states by erecting a barrier against movement of interstate trade. *City of Philadelphia, et al. v. New Jersey, et al.*, 437 U.S. 617, 98 S.Ct. 2531, 57 L.Ed.2d 475 (1978). The nation must be treated as an economic whole. "This principle that our economic unit is the Nation, which alone has the gamut of powers necessary to control of the economy, including the vital power of erecting customs barriers against foreign competition, has as its corollary that the states are not separable economic units." *H. P. Hood & Sons, Inc. v. DuMond*, supra, 69 S.Ct. at 665. The United States Supreme Court has repeatedly struck down statutes which had as their purpose the protection of local interests at the expense of interstate commerce. In each incidence, the Supreme Court has found that a state could not prefer the welfare of its own citizens to the economic well being of the nation.[88] Thus, in *West v. Kansas Natural*

**87.** This Court is in no way criticizing the Louisiana legislature for attempting to protect Louisiana citizens and industry.

**88.** The Supreme Court applied the same rationale to all types of natural resources. In *Foster-Fountain Packing Co. v. Haydel*, 278 U.S. 1, 49 S.Ct. 1, 73 L.Ed. 147 (1928), a Louisiana law requiring shrimp caught in the state to be hulled before entering interstate markets could not be justified on the grounds that the shrimp

were required to satisfy local demands. Similarly, Oklahoma could not prohibit out of state shipment of minnows caught in state waters. *Hughes v. Oklahoma*, 441 U.S. 322, 99 S.Ct. 1727, 60 L.Ed.2d 250 (1979). And finally in *City of Altus, Oklahoma v. Carr*, 255 F.Supp. 828 (W.D.Tx.1966) affirmed 385 U.S. 35, 87

*Gas Co.*, 221 U.S. 229, 31 S.Ct. 564, 55 L.Ed. 716 (1911), the Court found a statute which completely prohibited out of state shipment of natural gas to be unconstitutional. Although the Court recognized that natural gas and other resources may be available in limited amounts, the Court held that this was not a sufficient justification for seeking to allow only intrastate use of such a resource.

*West* was cited with approval in *Pennsylvania v. West Virginia*, supra, a case which involved a statute which required all pipeline companies to supply intrastate consumers before transporting any gas out of state. Relying heavily on *West*, the Supreme Court again concluded that a state cannot regulate or burden interstate commerce for the purpose of protecting local consumers. The Court found the statute unconstitutional even though West Virginia contended that the state's natural gas supply was being rapidly depleted.

More recently, in *Hicklin v. Orbeck*, 437 U.S. 518, 98 S.Ct. 2482, 57 L.Ed.2d 397 (1978) the Court reiterated that ". . . the Commerce Clause circumscribes a State's ability to prefer its own citizens in the utilization of natural resources found within its borders, but destined for interstate commerce." 98 S.Ct. at 2491. In the *Hicklin* case, the court examined the constitutionality of an Alaskan statute which provided that all local oil and gas leases and other transactions contain a provision requiring that qualified Alaskans be given preferred treatment in hiring. The court emphasized that the oil and gas which Alaska sought to regulate in such a discriminatory fashion was very important to national interests.[89]

■■■ The State of Louisiana relies heavily on *Reeves, Inc. v. Stake, et al.*, 447

U.S. 429, 100 S.Ct. 2271, 65 L.Ed.2d 244 (1980) to support its belief that protection of local economic interests is a sufficient goal to justify interference with interstate commerce. However, the *Reeves* case is clearly inapplicable under the facts of this case. In *Reeves* the Court upheld the constitutionality of a North Dakota statute which confined sales from a cement plant owned by North Dakota to its own residents. North Dakota had entered into the cement business and had itself become a market participant. Citing *Hughes v. Alexandria Scrap Corporation*, 426 U.S. 794, 810, 96 S.Ct. 2488, 49 L.Ed.2d 220 (1976), the Court found that "[n]othing in the purposes animating the Commerce Clause prohibits a State, in the absence of congressional action, from participating in the market and exercising the right to favor its own citizens over others." 96 S.Ct. at 2498. The Commerce Clause addresses itself to the impediment of free private trade. However, it does not seek to regulate a state that becomes a market participant. Thus, a state program supported by funds from the state treasury which limits benefits to state residents is not prohibited by the Commerce Clause.

In the case now pending before this Court, no state funds or state owned resources are involved. The Louisiana enactments seek to regulate the sale and transportation of *privately owned* natural gas. Louisiana's only justification for doing so is to protect local interests. This is precisely the type of legislative action prohibited by the Commerce Clause and by decisions rendered by the United States Supreme Court.

■■■ Since the Louisiana enactments discriminate against interstate commerce, they are constitutional only if a strong

---

S.Ct. 240, 17 L.Ed.2d 34 (1966), the Supreme Court affirmed a district court finding that a Texas statute which prohibited removal of underground water for interstate use without legislative permission was unconstitutional. In each case the Court refused to find that a goal of keeping scarce resources for local use was a legitimate purpose sufficient to justify interference with interstate commerce.

**89.** In *Baldwin v. G.A.F. Seelig, Inc.*, 294 U.S. 511, 55 S.Ct. 497, 500, 79 L.Ed. 1032 (1935) (quoted in *Hicklin*), the Supreme Court noted that the Constitution "was framed upon the theory that the peoples of the several states must sink or swim together and that in the long run prosperity and salvation are in union and not division."

showing is made that they serve a legitimate state purpose. Louisiana has failed to make such a showing in this case. According to the criteria set out in *Pike*, supra, the burden of interstate commerce caused by a local law can not be excessive when balanced against local benefits. Here, the burden is excessive.

The provisions of the various enactments involved in this case impede the free and natural flow of gas markets and, thus, discriminate against interstate users. Instead of promoting open market practices, the enactments initially limit the market to certain preferred customers—intrastate users, which is a burden on commerce. By requiring that intrastate users be offered a right of first refusal, the state legislation slows down the entire marketing process. Producers must wait until their offers to intrastate dealers are reviewed and rejected before they can attempt to sell natural gas in the interstate market. Because of the delay, a producer may be unable to take advantage of a more profitable interstate sale or may lose his interstate buyer completely. Interstate purchasers, unable to wait to determine whether gas will be available to them after it is offered to intrastate dealers, may find it necessary to turn to other markets to fulfill their needs. This clearly impedes the right of the natural gas producer to bring his product to the open market and attempt to obtain the best price for it at the minimal cost and in the quickest time possible.[90] The access guaranteed to the interstate market is either temporarily blocked or completely cut off by the terms of the legislation enacted by the Louisiana legislature.

Undue delay is not the only burden the enactments impose on interstate commerce. If the intrastate dealer purchases the gas offered to it, none may be left for interstate markets. The enactments also require that intrastate purchasers be given first

choice for all "new gas" not committed to interstate commerce before the effective date of the various enactments. The Louisiana provisions also require that gas which was subject to an intrastate contract that expired after the effective date of the provisions be offered to the same intrastate dealer again. In either case, if the intrastate dealer takes the gas, the interstate market may be completely deprived of natural gas. This causes an onerous burden on interstate commerce and operates to defeat the purpose of the Commerce Clause. Therefore, even assuming a legitimate purpose, the Louisiana provisions unduly burden interstate commerce.

Because the Louisiana enactments discriminate against interstate commerce on their face and in practical application, promote no legitimate local interest, and unduly burden interstate commerce, the Court must and does find Article IX § 2(B) of the Louisiana Constitution, Act 732 and Regulation 14 unconstitutional because each violates the Commerce Clause of the United States Constitution.

E. DO ARTICLE IX, § 2(B), ACT 732 AND REGULATION 14 VIOLATE THE DUE PROCESS CLAUSE OF THE FOURTEENTH AMENDMENT?

Because the Court has found that Article IX, § 2(B), Act 732 and Regulation 14 are unconstitutional under both the Supremacy and Commerce Clauses of the United States Constitution, the Court shall not determine the constitutionality of the Louisiana enactments under the Due Process Clause of the Fourteenth Amendment.

CONCLUSION

This Court has determined that Article IX, § 2(B) of the Louisiana Constitution, Act 732 of the 1979 Legislature, La.R.S. 30:607, and Regulation 14 issued by the

---

**90.** As pointed out in *H.P. Hood & Sons v. DuMond*, supra: "Our system, fostered by the Commerce Clause, is that every farmer and every craftsman shall be encouraged to produce by the certainty that he will have free access to every market in the Nation, that no home embargoes will withhold his export, and no foreign state will by customs duties or regulations exclude them. Likewise, every consumer may look to the free competition from every producing area in the Nation to protect him from exploitation by any." 69 S.Ct. at 665.

Louisiana Department of Natural Resources are unconstitutional under the Supremacy and Commerce Clauses of the United States Constitution. The Court must emphasize that the only issues before the Court pertain to the constitutionality of the Louisiana enactments. In declaring these provisions to be unconstitutional, this Court is in no way declaring that the NGA, NGPA or the regulations promulgated by FERC are the proper or most efficient method of solving the current and future energy problems of this country, particularly those associated with the exploration, production, pricing and transportation of natural gas.

A review of the evidence presented in this case reveals that many problems and issues remain to be solved. There is considerable debate and concern over future action which must and should be taken on price deregulation, protection of consumers in interstate and intrastate markets, curtailment of supplies in producing states, and methods to encourage additional production and exploration of natural gas to ensure sufficient availability of natural gas for the entire nation at reasonable prices. However, it is the function of the Congress and not the Court to determine the energy policy of this nation. This Court's function is to interpret the law and not act as a legislator and make the law. The Court must decide what the law is but should not amend the law.

Therefore, for the reasons set forth above:

IT IS ORDERED that Article IX, Section 2(B) of the Louisiana Constitution of 1974, Act 732 of the 1979 Regular Session of the Louisiana Legislature, La.R.S. 30:607, and Regulation 14 issued by the Louisiana Department of Natural Resources be and each is hereby declared unconstitutional.

IT IS FURTHER ORDERED that a permanent injunction be and it is hereby issued permanently enjoining the defendants, their successors, agents, and employees from administering and enforcing Article IX, Section 2(B) of the Louisiana Constitution of 1974, Act 732 of the 1979 Regular Session of

the Louisiana Legislature and Regulation 14 or any other regulation or order promulgated thereunder.

IT IS FURTHER ORDERED that a copy of the Court's judgment shall be served forthwith on Governor Dave Treen, Attorney General William J. Guste, Jr. and Commissioner of Conservation Raymond T. Sutton by the United States Marshal.

Judgment shall be entered accordingly.

### EXHIBIT 1
### DECLARATION OF EMERGENCY

Department of Natural Resources
Office of Conservation

The Department of Natural Resources, Office of Conservation, has adopted effective September 28, 1979, an emergency Interim Regulation No. 14, Governing the Provisions of Section 607 of Act 732 of the 1979 Regular Session of the Legislature. The regulation provides guidance to producer-sellers to facilitate sales of natural gas. Because of the approaching winter season, any delay of gas movements into the natural gas market may cause serious injury to the public health, safety, and welfare. The emergency rule follows:

Interim Regulation No. 14 Governing the Provisions of Section 607 of the Act (Act 732, 1979)

A. This regulation shall only apply to the requirements of R.S. 30:607.

B. No person shall dedicate natural gas to or introduce said natural gas into interstate commerce or connect said person's intrastate natural gas pipeline as defined herein with an interstate pipeline without first obtaining a certificate of public convenience and necessity issued by the Commissioner of Conservation. No certificate of public convenience and necessity shall be issued to a producer-seller unless:

1. In the case of natural gas which is the subject of an intrastate sales contract that will expire subsequent to September 7, 1979, the producer-seller has first offered such gas to the person who is the purchaser of such gas at the same price at which the gas could be sold to any

other person pursuant to arm's length negotiations and under other terms, conditions, and circumstances as favorable as those which could be obtained for the sale of such gas to any other user in the state of Louisiana, including intrastate natural gas transporters.

2. In those cases where (a) the offer provided for in Paragraph 1 above has been refused and (b) where the natural gas was not the subject of an intrastate sales contract, the producer-seller has made a bona fide offer to sell such natural gas to intrastate natural gas transporters capable of taking delivery within a reasonable time.

C. As used in this regulation, the words and phrases defined herein shall have the following meanings:

1. Gas committed or dedicated to interstate commerce:

 a. shall mean gas which is subject to federal jurisdiction under the Natural Gas Act, 15 U.S.C. 717, et seq., or

 b. shall mean all gas dedicated or contractually committed to interstate commerce before September 7, 1979, or

 c. shall mean such quantities of natural gas that a producer-seller is required to commit to interstate commerce pursuant to an order issued by the Federal Power Commission or the Federal Energy Regulatory Commission prior to September 7, 1979.

2. Bona fide offer: for purposes of R.S. 30:607C(2) and this regulation, a bona fide offer shall be deemed made by a producer-seller when he notifies all intrastate natural gas transporters on file with the Commissioner that he will entertain bids for the purchase of natural gas at the same price, terms, conditions, and circumstances as the producer-seller could obtain in interstate commerce. Such bids must be received by the producer-seller within thirty days of the date the notice is sent.

3. Natural gas: shall mean all gas capable of being produced or which is produced within the state of Louisiana which is not subject to federal jurisdiction under the Natural Gas Act, 15 U.S.C. 717, et seq., including natural gas transported through the use of interstate pipelines where such use of interstate pipelines is or may hereafter be exempt from the control of the Federal Energy Regulatory Commission under the Natural Gas Act or rules and regulations promulgated by the Federal Energy Regulatory Commission thereunder; and gas, wherever produced, which is or may be transported into this state and delivered into an intrastate pipeline system in this state to be used or consumed wholly within this state.

4. Intrastate natural gas pipeline: shall mean all facilities located within the state of Louisiana which may be or are utilized for the production, gathering or transportation of intrastate natural gas and which are not subject to federal jurisdiction under the Natural Gas Act, 15 U.S.C. 717, et seq., including, but not limited to, wellhead facilities, gathering facilities, pipeline facilities, and all facilities connected thereto or utilized therewith.

5. Intrastate natural gas transporter: shall mean a person as defined in R.S. 30:503(6).

6. Interested parties:

 a. shall, for an application for an exclusion, be the interstate purchaser and any other persons whose facilities are used in processing or transporting such natural gas.

 b. shall, for an application for a certificate of public convenience and necessity, be the intrastate natural gas transporters who have responded pursuant to request for purchase of natural gas as provided hereinabove, the interstate purchaser, and any other persons whose facilities are used in processing or transporting such gas.

 c. shall, for a letter of objection pursuant to R.S. 30:607C(3), be the parties to the contract.

D. For all natural gas committed or dedicated to interstate commerce before September 7, 1979, which has not been con-

nected to or introduced into an interstate pipeline on said date, the Commissioner may, upon receipt of due proof of said commitment or dedication, issue an order excluding the producer-seller hereunder and authorizing the producer-seller to make such connection with or to introduce such natural gas into the applicable interstate pipeline. The Commissioner after review may administratively issue said order. Intrastate natural gas pipelines and gas gathering lines which were subject to Article IX, Section 2 of the Louisiana Constitution of 1974, prior to September 7, 1979, shall not enjoy this exclusion.

E. An application to the Commissioner for an order under Paragraph D or for a certificate of public convenience and necessity shall be made by the producer-seller in writing, verified under oath by an individual having authority to execute same and contain the following information:

1. Order under Paragraph D.

a. a certified copy of the executed contract.

b. a completed Form PL 3.

c. a general description and diagrammatic sketch of facilities required to effect the movement of contracted gas from the wellhead to the point of delivery into interstate commerce; including the names and addresses of any other persons whose facilities are used in the processing or transporting of such natural gas.

2. Certificate of public convenience and necessity.

a. the exact legal name of the applicant; its principal place of business; and the name, title, and mailing address of the person or persons to whom communications concerning the application are to be addressed.

b. all information required to be filed under Paragraph E.1 above.

c. proof that a bona fide offer was made to sell such contracted natural gas.

The Commissioner may request such additional information as in his opinion is reasonably necessary to properly evaluate the application.

F. If a person who is a party to an intrastate gas sales contract subject to R.S. 30:607C(3) files a letter of objection with the Commissioner of Conservation alleging noncompliance with this regulation and Section 607C(3), the Commissioner shall proceed under Rule 5 of the Commissioner's Rules of Procedure to resolve all matters of controversy. The producer-seller shall bear the burden of establishing that it has, pursuant to arm's length negotiations, made an offer to the present purchaser of said gas, to continue said sale at the same price, at which the gas could be sold to any other person, except where otherwise provided by law, and under other terms, conditions, and circumstances as favorable as those which could be obtained for the sale of such gas to any other user in the state of Louisiana, including intrastate natural gas transporters. The producer-seller shall make the offer to the purchaser of gas under an intrastate natural gas contract no less than forty-five days prior to the termination of said contract. A letter of objection by either party must be filed with the Commissioner at least twenty days prior to the termination date of the contract. Should the matter require hearing the person filing the letter of objection shall submit a filing fee of one hundred dollars by check payable to the Louisiana Office of Conservation. All parties shall provide such additional information as the Commissioner in his opinion deems reasonably necessary to properly evaluate the matter.

G. In determining the public interest, the Commissioner shall take into consideration pertinent circumstances surrounding the producer-seller, user and intrastate natural gas transporter, with due consideration being given to the economics and lease obligations.

H. Except as indicated in Paragraph D above, no order, ruling, or finding may be made or other action taken with respect to this regulation without a public hearing after due notice to all interested parties unless the right to a public hearing is waived pursuant to the provisions of the Adminis-

trative Procedures Act, as amended (R.S. 49:951 et seq.)

R. T. Sutton
Commissioner of Conservation